## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

M. DIANE KOKEN, in her official capacity  :
as Insurance Commissioner of the Commonwealth  :
of Pennsylvania, as Liquidator of RELIANCE  :
INSURANCE COMPANY (IN LIQUIDATION)  :
1311 Strawberry Square  :
Harrisburg, Pennsylvania 17120  :
                                   :

            Plaintiff,  :

           v.  :      CIVIL ACTION NO. _____

                                     :

PAULA FINANCIAL.  :
87 East Green Street  :
Suite 206  :
Pasadena, California 91105  :
                                   :

           Defendant.  :

## COMPLAINT

    Plaintiff M. Diane Koken, in her official capacity as Insurance Commissioner of the Commonwealth of Pennsylvania, as Liquidator (the "Liquidator") of Reliance Insurance Company (in Liquidation) ("Reliance"), by and through her attorneys, Fox Rothschild LLP, asserts the following Complaint for breach of contract against defendant PAULA Financial ("PAULA"). The Liquidator seeks damages from PAULA, including interest, attorneys' fees and costs. The damages arise out of a Guarantee and Indemnification agreement given by PAULA to Reliance and PAULA's refusal to pay Reliance $3,039,795 in retrospective premium and $39,254 in deductible reimbursements owed on a workers' compensation policy issued by Reliance to a now bankrupt insured. In support of this Complaint, the Liquidator avers as follows:

## THE PARTIES

1.    The Liquidator is acting in her official capacity as Insurance Commissioner of the Commonwealth of Pennsylvania and brings this action pursuant to the October 3, 2001 Order of the Commonwealth Court of Pennsylvania naming her as the Liquidator of Reliance (the "Liquidation Order").  A true and correct copy of the Liquidation Order is attached as Exhibit "A" hereto and incorporated herein by reference.  The Liquidator's official place of business is 1311 Strawberry Square, Harrisburg, Pennsylvania 17120.

2.    Reliance is a Pennsylvania domiciled insurance company with its principal place of business located at Three Parkway, Philadelphia, Pennsylvania 19102.

3.    Pursuant to article V, section 523(12) of Pennsylvania's Insurance Department Act of 1921, 40 P.S. § 221.23(12) and the Liquidation Order, the Liquidator is authorized to bring this action on behalf of Reliance.

4.    PAULA is a Delaware corporation with its principal place of business located at 87 East Green Street, Suite 206, Pasadena, California 91005.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 because PAULA resides in the District of Delaware.

## FACTUAL BACKGROUND

### The March 15, 1999 PAULA Guarantee and Indemnification

7.    In 1999, Montlake Insurance Holdings, LLC f/k/a Altus Insurance Holdings, LLC ("MIH") requested that Reliance serve as the issuing insurance company to underwrite workers' compensation and United States Longshore and Harbor Worker's Compensation Act insurance for risks located in various states (the "WC Policies") and enter into an Underwriting Management Agreement with MIH (the "UM Agreement").

8.    The risk of loss assumed by Reliance on the WC Policies were to be wholly reinsured by Zurich Reinsurance (North America), Inc. n/k/a Converium ("Zurich").

9.    To induce Reliance to serve as the underwriting insurer for the WC Policies, PAULA agreed to guarantee payment and provide indemnification to Reliance against certain exposures by reason of Reliance's issuing the WC Policies.

10.    PAULA entered into the Guarantee and Indemnification agreement with Reliance on March 15, 1999 (the "Guarantee"). A true and correct copy of the Guarantee is attached as Exhibit "B" hereto and incorporated herein by reference.

11.    The Guarantee provides, in pertinent part, that PAULA:

7.    Unconditionally and irrevocably guarantees to Reliance the due and punctual payment (within five (5) business days of written notice of Reliance therefor) of:

a.    all deductible reimbursement obligations of policyholders under any policy issued with deductible provisions;

b.    all premium adjustments of retrospective rated or loss sensitive policies;

\*    \*    \*    \*    \*    \*    \*

      d.   and any costs and expenses incurred by Reliance in enforcing this Guarantee and Indemnification.

*See* Guarantee, ¶ 7.

12.    The Guarantee further provided that PAULA:

    8.    Waives (i) any right to require Reliance to exhaust remedies against either Altus [MIH] or Zurich or to take any other action against Altus [MIH] or Zurich, (ii) any requirement that Reliance file any claim in the event of the insolvency or bankruptcy of Altus [MIH] or Zurich, (iii) any defenses available to PFC [PAULA] regarding bankruptcy, insolvency or other similar matter, (iv) notice of, or any right to contest the enforceability of this Guarantee and Indemnification based upon, any modification of any agreement that Reliance may have had with Altus [MIH] or Zurich, (v) notice of any default under or breach of any agreement by Altus [MIH] or Zurich of any agreement Reliance may have with Altus [MIH] or Zurich, (vi) demand and presentation by Reliance for payment upon Altus [MIH] or Zurich, (vii) protest, notice of protest and diligence of bringing suit against Altus [MIH] or Zurich, and (viii) any other defenses available to PFC [PAULA] that are not available to Altus [MIH] or Zurich. PFC [PAULA] further waives any and all defenses and discharges available to an indemnitor, guarantor, surety or co-obligor as such to the full extent permitted by law.

    9.    Agrees that this Guarantee and Indemnification will not be discharged except by complete performance by Altus [MIH] and Zurich of all their respective obligations to Reliance arising from any agreements Reliance may have with Altus [MIH] or Zurich and by PFC [PAULA] of all of its obligations under this Guarantee and Indemnification. . . .

*See* Guarantee, ¶¶ 8 and 9.

**The March 15, 1999 Underwriting and Management Agreement**

13.    Reliance and MIH entered into the UM Agreement on March 15, 1999. A true and correct copy of the UM Agreement is attached as Exhibit "C" hereto and incorporated herein by reference.

14.    Under the UM Agreement, MIH was appointed to act as underwriting manager on behalf of Reliance for the WC Policies.

4

**The Reliance Policy**

15.    On March 15, 2000, MIH underwrote and bound workers' compensation and employer's liability insurance Policy No. ICW 1950507 which was issued by Reliance (the "Reliance Policy") to Friede Goldman Halter, Inc. ("Friede"). The Reliance Policy, effective for the period March 15, 2000 to March 15, 2001, was cancelled for non-payment effective as of September 15, 2000. The Reliance Policy is attached as Exhibit "D" hereto and incorporated herein by reference.

16.    The Reliance Policy is a combined aggregate deductible reimbursement - retrospective premium policy.

17.    The Reliance Policy contained a deductible reimbursement endorsement to the Reliance Policy under which Friede was required to reimburse Reliance for losses and ALAE, subject to an individual deductible of $250,000 per claim and an aggregate deductible of $2,900,050.

18.    The Reliance Policy also contained a retrospective premium endorsement subject to a minimum premium and a maximum premium and that provided for annual calculation of retrospective premium.

19.    Under the retrospective premium endorsement to the Reliance Policy, the retrospective premium amount due and owing is calculated in accordance with the insured's loss experience.

20.    Pursuant to the terms of the Reliance Policy, Reliance agreed to provide Friede with workers' compensation and employer's liability insurance in return for the promise to pay estimated premiums and retrospective premium and to reimburse deductible amounts due up to the aggregate deductible.

21. Since October 3, 2001, the date of the Reliance Liquidation Order, numerous state guaranty associations have made claims payments on behalf of Friede under the Reliance Policy and sought reimbursement from Reliance.

22. Reliance has calculated retrospective premium due under the Reliance Policy based on claims payments made by state guaranty associations on behalf of Friede under the Reliance Policy.

23. As of the valuation date of June 30, 2005, the total losses and ALAE incurred on the Reliance Policy was $10,420,390. The retrospective premium calculation was $6,981,665. However, the maximum amount of retrospective premium that could be collected under the Reliance Policy was $4,996,984 (the "Maximum Retrospective Premium").

24. Friede had previously paid Reliance $1,957,189 in retrospective premium.

**Unpaid Retrospective Premium and Deductibles**

25. Pursuant to the terms and conditions of the Reliance Policy, there is currently a balance in the amount of $3,039,795 due and owing from Friede to Reliance in unpaid retrospective premium adjustments based on the Maximum Retrospective Premium of $4,996,984 less the $1,957,189 in retrospective premium previously paid by Friede.

26. Pursuant to the terms and conditions of the Reliance Policy, there is currently a balance in the amount of $39,254 due and owing from Friede to Reliance in unpaid deductible reimbursements based on the maximum aggregate deductible limit of $2,900,050 less the deductible reimbursements of $2,860,796 previously paid by Friede.

**Bankruptcy of Friede**

27.    On April 19, 2001, Friede and various subsidiaries of Friede filed separate Chapter 11 bankruptcy petitions.

**Demand for Payment**

28.    On October 17, 2005, Reliance demanded that PAULA honor its Guarantee and pay the retrospective premium adjustment balance due of $3,039,795 and the remaining deductible reimbursements due of $39,254 under the Reliance Policy.

29.    PAULA has failed and refused to pay the retrospective premium and deductible reimbursements.

## COUNT I
## BREACH OF CONTRACT

30.    The Liquidator incorporates by reference the averments contained in paragraphs 1 through 29 above.

31.    Reliance fully performed all of its obligations under the Reliance Policy.

32.    Under the Reliance Policy, Reliance is currently owed $3,039,795 in retrospective premium.

33.    Despite demand pursuant to the Guarantee, PAULA has failed and refused to pay the retrospective premium and has breached its obligation under the Guarantee.

34.    PAULA's breach of the Guarantee has caused the Liquidator to sustain damages to date in the amount of $3,039,795.

35.    In addition, Reliance is entitled to recover its costs and expenses, including attorneys' fees, incurred in enforcing its rights under the Guarantee.

7

**WHEREFORE,** the Liquidator demands judgment in her favor and against defendant PAULA Financial in the amount of $3,039,795, plus interest, attorneys' fees and costs and such other relief as the Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT

36.    The Liquidator incorporates by reference the averments contained in paragraphs 1 through 35 above.

37.    Reliance fully performed all of its obligations under the Reliance Policy.

38.    Under the Reliance Policy, Reliance is owed $39,254 in unpaid deductible reimbursements.

39.    Despite demand pursuant to the Guarantee, PAULA has failed and refused to pay the unpaid deductible reimbursements and has breached its obligation under the Guarantee.

40.    PAULA's breach of the Guarantee has caused the Liquidator to sustain damages in the amount of $39,254.

41.    In addition, Reliance is entitled to recover its costs and expenses, including attorneys' fees, incurred in enforcing its rights under the Guarantee.

**WHEREFORE,** the Liquidator demands judgment in her favor and against defendant PAULA Financial in the amount of $39,254 plus interest, attorneys' fees and costs and such other relief as the Court deems just and proper.

By:    */s/ Sheldon K. Rennie (#3772)*

Sheldon K. Rennie, Esquire (I.D. No. 3772)
FOX ROTHSCHILD LLP
919 N. Market Street, Suite 1300
P.O. Box 2323
Wilmington, DE 19899-2323
(302) 654-7444

-AND-

Of Counsel

Gerald E. Arth, Esquire
Cheryl A. Garber, Esquire
FOX ROTHSCHILD LLP
2000 Market Street, Tenth Floor
Philadelphia, PA 19103-3291
(215) 299-2000

*Attorneys for Plaintiff*

Dated: January 26, 2007

# EXHIBIT "A"

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

M. Diane Koken,
Insurance Commissioner of the
Commonwealth of Pennsylvania,
      Plaintiff

     v.

Reliance Insurance Company,
    Defendant

:   No. 269 M.D. 2001

## ORDER OF LIQUIDATION

      AND NOW, this 3rd day of October, 2001, upon consideration of the Petition of M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania, in her capacity as Rehabilitator of Reliance Insurance Company for Liquidation in accordance with Article V of the Insurance Department Act of 1921, as amended, 40 P.S. §211, et seq. and the Consent thereto, it is hereby ORDERED and DECREED that said Petition is GRANTED.

It is further **ORDERED** and **DECREED** that:

1.    The rehabilitation of Reliance Insurance Company ("Reliance" or the "Company") commenced under this Court's Order of May 29, 2001 is hereby **TERMINATED**.

2.    Reliance is hereby found to be and is declared **INSOLVENT**, as that term is defined in 40 P.S. §§ 221.3, and as provided in 40 P.S. §§ 221.14(1) and 221.19.

3.    Commissioner M. Diane Koken and her successors in office (the "Commissioner") are hereby **APPOINTED** Liquidator of Reliance and the Liquidator or her designees (the "Liquidator") are directed immediately to take possession of Reliance's property, business and affairs as Liquidator, and to liquidate Reliance in accordance with Article V of the Insurance Department Act of 1921, as amended (40 P.S. §§211 et seq.) (the "Act"), and to take such action as the interest of the policyholders, creditors or the public may require.

4.    The Liquidator is hereby **VESTED** with all the powers, rights, and duties authorized under the Act and other applicable law.

## ASSETS OF THE ESTATE

5.    The Commissioner, as Liquidator, is vested with title to all property, assets, contracts and rights of action ("assets") of Reliance, of whatever nature and wherever located, whether held directly or indirectly, as of the date of the filing of the Petition for Liquidation.  All assets of Reliance are hereby found to be in custodia legis of this Court; and this

2

Court specifically asserts, to the fullest extent of its authority, (a) in rem jurisdiction over all assets of the Company wherever they may be located and regardless of whether they are held in the name of the Company or any other name; (b) exclusive jurisdiction over all determinations of the validity and amount of claims against Reliance; and (c) exclusive jurisdiction over the determination of the distribution priority of all claims against Reliance.

6.    The filing or recording of the Order with the clerk of the Commonwealth Court or with the recorder of deeds of the county in which the principal business of Reliance is conducted, or the county in which its principal office or place of business is located, shall impart the same notice as a deed, bill of sale or other evidence of title duly filed or recorded with that recorder of deeds would have imparted.

7.    All banks, investment bankers, companies, other entities or other persons having in their possession assets which are, or may be, the property of Reliance, shall, unless otherwise instructed by the Liquidator, deliver the possession of the same immediately to the Liquidator, and shall not disburse, convey, transfer, pledge, assign, hypothecate, encumber or in any manner dispose of the same without the prior written consent of, or unless directed in writing by, the Liquidator.

8.    All persons and entities are enjoined from disposing of or destroying any records pertaining to any transactions between Reliance and any party.

9.    The amount recoverable by the Liquidator from any reinsurer shall not be reduced as a result of this Order of Liquidation,

3

regardless of any provision in a reinsurance contract or other agreement. Payment made directly by the reinsurer to an insured or other creditor of Reliance shall not diminish the reinsurer's obligation to Reliance, except to the extent provided by law.

10.    All agents, brokers, and other persons having sold policies of insurance issued by Reliance shall account for and pay all unearned commissions and all premiums, collected and uncollected, for the benefit of Reliance directly to the Liquidator, within 30 days of notice of this Order.  No agent, broker, reinsurance intermediary or other person shall disburse or use monies which come into their possession and are owed to, or are claimed by, Reliance for any purpose other than payment to the Liquidator.

11.    If requested by the Liquidator, all attorneys employed or retained by Reliance or performing legal services for Reliance as of the date of this Order shall, within 30 days of such request, report to the Liquidator the name, company claim number (if applicable) and status of each matter they are handling on behalf of Reliance.  Said report shall include the full caption, docket number and name and address of opposing counsel in each case and an accounting of any funds received from or on behalf of Reliance for any purpose and in any capacity.

12.    Any entity furnishing telephone, water, electric, sewage, garbage, delivery, trash removal, or utility services to Reliance shall maintain such service and create a new account for the Liquidator as of the date of this Order upon instruction by the Liquidator.

4

13.    Any entity (including any affiliate of Reliance) which has custody or control of any data processing information and records (including but not limited to source documents, all types of electronically stored information, master tapes or any other recorded information) relating to Reliance, shall transfer custody and control of such records in a form readable by the Liquidator to the Liquidator as of the date of this Order, unless instructed to the contrary by the Liquidator.

14.    Any entity (including any affiliate of Reliance) furnishing claims processing or data processing services to Reliance shall maintain such services and transfer any such accounts to the Liquidator as of the date of this Order, unless instructed to the contrary by the Liquidator.

15.    Reliance, its affiliates, and their officers, directors, trustees, employees, consultants, agents, and attorneys, shall: surrender peacefully to the Liquidator the premises where Reliance conducts its business; deliver all keys or access codes thereto and to any safe deposit boxes; advise the Liquidator of the combinations or access codes of any safe or safekeeping devices of Reliance or any password or authorization code or access code required for access to data processing equipment; and shall deliver and surrender peacefully to the Liquidator all of the assets, books, records, files, credit cards, and other property of Reliance in their possession or control, wherever located, and otherwise advise and cooperate with the Liquidator in identifying and locating any of the foregoing.

16.    Except for contracts of insurance and for reinsurance, all executory contracts to which Reliance is a party as of the date of this Order

5

may be affirmed or disavowed by the Liquidator within 90 days of the date of this Order.

## CONTINUATION AND CANCELLATION OF COVERAGE

17.    All policies and contracts of insurance, whether issued within this Commonwealth or elsewhere, in effect on the date of this Order shall continue in force only with respect to risks in effect at that time, for the lesser of the following:  (a) thirty days from the date of this Order; (b) until the normal expiration of the policy or contract providing insurance coverage; (c) until the insured has replaced the insurance coverage with equivalent insurance with another insurer or otherwise terminated the policy; or (d) until the Liquidator has effected a transfer of the policy obligation pursuant to Section 221.23(8).   All policies or contracts of insurance issued by Reliance are hereby cancelled and terminated for all purposes effective thirty days from the date of this Order.

## WORKERS COMPENSATION AND PERSONAL INJURY PROTECTION CLAIMS

18.    For a period not to exceed 90 days from entry of this Order, the Liquidator is authorized but not obligated, in her sole discretion, to make arrangements for the continued payment in full of the claims under policies of workers compensation and under policies providing personal injury protection (PIP) by making the facilities, computer systems, books, records and arrangements with third party administrators (to the extent possible) of Reliance available for the processing and payment of such

6

claims, to any affected guaranty association (or other entity that is the functional equivalent) and to states and state officials holding statutory deposits for the benefit of such workers compensation and PIP claimants, provided, however, that such guaranty associations, states or state officials shall provide or make available the funds to make the actual payment of such claims. In circumstances where a guaranty association certifies in writing to the Liquidator that it does not have the immediate ability to fund the payment of workers compensation and PIP claims that are its obligation by law, the Liquidator is authorized to advance the funds, if available, from Reliance to pay such claims on a temporary basis for a period not to exceed 90 days, provided that the guaranty association enters into a written agreement that such advances shall be treated as a distribution pursuant to 40 P.S. §221.36. The Liquidator shall have the discretion to accept such interim assurances as she deems adequate in lieu of a formal agreement.

## NOTICE AND PROCEDURES FOR FILING CLAIMS

19.    The Liquidator shall give notice by first-class mail to all persons which or who may have claims against Reliance, contingent or otherwise, as disclosed by its books and records, and advising claimants to file with the Liquidator their claims together with proper proofs thereof on or before the date (which shall be no earlier than one year from the date of the notice) the Liquidator shall specify therein. The Liquidator shall also cause a notice to be published in newspapers of general circulation where Reliance has its principal places of business, as well as in the national edition of the Wall Street Journal, (a) specifying the last day for the filing of claims; (b) advising all persons of the procedure by which all persons may

present their claims to the Liquidator; (c) advising all persons of the Liquidator's office wherein they may present their claim; and (d) advising all persons of their right to present their claim or claims to the Liquidator. Any and all persons, firms, or corporations having or claiming to have any accounts, debts, claims or demands against Reliance, contingent or otherwise, or claiming any right, title, or interest in any funds or property in the possession of the Liquidator are required to file with the Liquidator at the location designated in the above-described notices, on or before the date specified by the Liquidator as the last date upon which to file a claim (which shall be no earlier than one year from the date of the notice), a properly completed proof of claim or be thereafter barred as claimants against any assets in the hands of the Liquidator, unless a late filing is permitted under 40 P.S. §221.37. No person shall participate in any distribution of the assets of Reliance unless such claims are filed and presented in accordance with and within the time limit established by the Liquidator, subject to the provisions for the late filing of claims in 40 P.S. §221.37.

### EXPENSES, PAYMENTS AND LAWSUITS

20.    Without filing a petition for distribution, the Liquidator shall have the discretion to pay as costs and expenses of administration, pursuant to 40 P.S. §221.44, the actual, reasonable and necessary costs of preserving or recovering assets of Reliance and the costs of goods or services provided to and approved by Reliance (In Rehabilitation) or this Court during the period of Rehabilitation and that are unpaid as of the date of this Order. The rights and liabilities of Reliance and of its creditors,

8

policyholders, trustees, shareholders, members, and all other persons interested in this estate shall be determined in accordance with the Act as of the date of the filing of the Petition for Liquidation.

21. Reliance, its affiliates, or their directors, officers, trustees, employees, attorneys, brokers, consultants, agents, insureds, creditors, and any other persons, wherever located, are enjoined from: (a) the transaction of further business; (b) transferring, selling, concealing, terminating, canceling, destroying, disbursing, disposing of or assigning any assets, funds or other property of any nature; (c) any interference, in any manner, with Commissioner M. Diane Koken or her successors, or any of her designees in liquidating Reliance's business and affairs; (d) any waste of Reliance's assets or property; (e) the dissipation and transfer of bank accounts and negotiable instruments; (f) the institution or further prosecution of any actions in law or equity on behalf of or against Reliance; (g) the obtaining of preferences, judgments, attachments, garnishments or liens against Reliance's assets, property and policyholders; (h) the levy of execution process against Reliance and its assets, property and policyholders; (i) the negotiation or execution of any agreement of sale or deed conveying personal or real property for nonpayment of taxes or assessments or for any other purpose; (j) withholding from the Liquidator or her designees or removing, concealing, transferring or destroying books, accounts, documents, policies or policy related documents or other records relating to Reliance's business; (k) making any assessments or indirectly collecting such assessments by setting them off against amounts otherwise payable to Reliance; (l) attempting to collect unpaid premiums, deductibles

9

or self insured retentions from Reliance's insureds; and (m) the taking of any other action which might lessen the value of Reliance's assets or property, prejudice the rights and interests of policyholders and creditors, or interfere in the administration of the proceeding.

       22.    Unless the Liquidator consents thereto in writing, no action at law or equity, or arbitration or mediation, shall be brought against Reliance or the Liquidator, whether in this Commonwealth or elsewhere, nor shall any such existing action be maintained or further prosecuted after the date of this Order.  All actions, including arbitrations and mediations, currently pending against Reliance in the courts of the Commonwealth of Pennsylvania or elsewhere are hereby stayed.  All actions, arbitrations and mediations, against Reliance or the Liquidator shall be submitted and considered as claims in the liquidation proceeding.

       23.    All proceedings in which Reliance is obligated to defend a party in any court of this Commonwealth are hereby stayed for ninety (90) days from the date this Order.  The Liquidator, pursuant to 40 P.S. §221.5(a), her designees and/or the Pennsylvania Property and Casualty Insurance Guaranty Association may petition this Court for extensions as needed in the exercise of their respective discretion.  With respect to suits and other proceedings in which Reliance is obligated to defend a party, pending outside the Commonwealth of Pennsylvania and in federal courts of the United States, this Order constitutes the request of this Court for comity in the imposition of a 90-day stay by such courts or tribunals, and that those courts afford this order deference by reason of this Court's responsibility for

and supervisory authority over the rehabilitation of Reliance, as vested in this Court by the Pennsylvania Legislature  The Liquidator is authorized to cooperate in assisting any guaranty association in any jurisdiction to enforce any stay of any action provided for in any relevant law of another state.  Any person that fails to honor a stay ordered by this Court or violates any provision of this Order, where such person has a claim against Reliance, shall have their claim subordinated to all other claims in the same class, with no payment being made with respect to such claim until all others in the same class have been paid in full, in addition to any other remedies available at law or in equity.

24.  No judgment or order against Reliance or its insureds entered after the date of filing of the Petition for Liquidation, and no judgment or order against Reliance entered at any time by default or by collusion, need be considered as evidence of liability or quantum of damages by the Liquidator.

25.  No action or proceeding in the nature of an attachment, garnishment, or execution shall be commenced or maintained in this Commonwealth or elsewhere against Reliance or the Liquidator, or their assets.

26.  All secured creditors or parties, pledges, lienholders, collateral holders or other person claiming secured, priority or preferred interests in any property or assets of Reliance are hereby enjoined from taking any steps whatsoever to transfer, sell, assign, encumber, attach,

11

dispose of, or exercise, purported rights in or against any property or assets of Reliance except as provided in 40 P.S. §221.43.

27.    All references to "Reliance" herein shall include the former subsidiaries which were previously merged into Reliance Insurance Company with approval of the Commissioner, including Reliance National Indemnity Company, Reliance National Insurance Company, United Pacific Insurance Company, Reliance Direct Company, Reliance Surety Company, Reliance Universal Insurance Company, United Pacific Insurance Company of New York and Reliance Insurance Company of Illinois.

28.    This Order shall be effective on the date of entry specified above and supercedes this Court's Order of May 29, 2001.

29.    Further, this Order supercedes any order entered by this Court prior to 12:00 noon, October 3, 2001.

The Rehabilitator, through its counsel, is hereby directed to forthwith, serve a copy of this order upon all parties listed on the master service list via fax and/or e-mail and U.S. mail, if necessary. The Rehabilitator, through its counsel, is directed to file with the court in the Office of the Prothonotary, 9th Floor the Widener Building, 1339 Chestnut Street, Philadelphia, PA 19107, by 1:00 p.m. October 9, 2001 an affidavit, that service, as outlined above, has been effectuated.

*JAMES GARDNER COLINS, Judge*

12

# EXHIBIT "B"

## PAULA FINANCIAL
## GUARANTEE AND INDEMNIFICATION

### BACKGROUND TO GUARANTEE AND INDEMNIFICATION

WHEREAS, PAULA Financial, a Delaware corporation ("PFC") is a member and equity holder of Altus Insurance Holdings, LLC, a limited liability company formed under the laws of Delaware ("Altus");

WHEREAS, Altus has requested Reliance Insurance Company, Reliance National Insurance Company, Reliance National Indemnity Company and United Pacific Insurance Company ("Reliance") to be the issuing insurance company for the underwriting of Workers' Compensation and United States Longshore and Harbor Worker's Compensation Act insurance for risks principally located in the states of Alabama, Alaska, California, Louisiana, Mississippi, Oregon, Texas and Washington ("WC Policies") and to enter into an Underwriting Management Agreement effective February 1, 1999 to do so ("UM Agreement");

WHEREAS, the risk of loss assumed by Reliance on the WC Policies is wholly reinsured to Zurich Reinsurance (North America), Inc. ("Zurich") and subsequently retroceded in part by Zurich to Paula Insurance Company (a subsidiary of PFC) and Altus Casualty Insurance Company, Ltd (a subsidiary of Altus);

WHEREAS, Altus and PFC wish to induce Reliance to be the underwriting insurer for the WC Policies but Zurich is unwilling to accept and assume as reinsurer certain risks associated with and assumed by Reliance in underwriting the WC Policies which Reliance is unwilling to retain without the guarantee and indemnification of PFC;

WHEREAS, Reliance is willing to become an issuing insurance carrier for the WC Policies if PFC guarantees payment and provides indemnification against certain exposures that Reliance assumes or is exposed to by reason of underwriting and issuing the WC Policies;

NOW THEREFORE, for value received and acknowledged by PFC as sufficient and received and in further consideration of the agreement of Reliance to become the issuing insurance carrier for the WC Policies and intending to be legally bound, PFC:

1.  Unconditionally and irrevocably will indemnify, hold harmless and reimburse Reliance for a share of all taxes, assessments, fees, loss, allocated loss expense, and related costs and expenses ("assessments"), incurred by Reliance that arise from risks assigned to Reliance under the workers' compensation and United States Longshore and Harbor Worker's Compensation Act residual market plan(s) of any jurisdiction (including the United States) that in the sole discretion of Reliance are incurred by Reliance due to the issuance by Reliance of the WC Policies under the UM Agreement in that jurisdiction. The amount of indemnity and reimbursement due Reliance from PFC will equal the sum obtained by multiplying the Reliance actual net loss incurred by Reliance from the residual market mechanism in that jurisdiction by the fraction obtained by dividing the gross premium written by Reliance from WC Policies in that jurisdiction under the UM Agreement by the total gross premium written for all workers' compensation policies in that jurisdiction by Reliance, all as respects the period under calculation.

2.  Unconditionally and irrevocably will indemnify, hold harmless, and reimburse Reliance for a share of all taxes, assessments, fees, loss, allocated loss expense, and related costs and expenses ("assessments"), incurred by Reliance that arise from and are levied by reason of the mandated membership or participation of Reliance in any guarantee association, insolvency fund, FAIR Plan, or similar pool, association or syndicate ("Funds and Pools") of any jurisdiction that in the sole discretion of Reliance are incurred by Reliance due to the issuance by Reliance of the WC Policies under the UM Agreement in that jurisdiction. The amount of indemnity and reimbursement due Reliance from PFC will equal the sum obtained by multiplying the Reliance net assessments (after applying credits actually received by Reliance by reason of the

**PAULA FINANCIAL**
**GUARANTEE AND INDEMNIFICATION**

assessments, if any) from the Funds and Pools in that jurisdiction by the fraction obtained by dividing the gross premium written by Reliance from WC Policies in that jurisdiction under the UM Agreement by the total gross premium written for all policies that form the basis in that jurisdiction for assessments from the Funds and Pools, all as respects the period under calculation.

3.    Unconditionally and irrevocably will indemnify, hold harmless, and reimburse Reliance for all fines and related regulatory charges and assessments, as well as related legal defense costs, levied by any jurisdiction or any statistical reporting agency or workers' compensation rating bureau in that jurisdiction by reason of the actions or inactions of Altus in connection with any WC Policy issued by Reliance under the UM Agreement in that jurisdiction;

4.    Unconditionally and irrevocably will indemnify, hold harmless, and reimburse Reliance from and against any and all claims, suits, loss, damage, liability, costs and expenses, including reasonable attorney fees, incurred by Reliance and arising from the professional acts, errors or omissions of Altus in performing under the UM Agreement including but not limited to, without limitation, acts, errors or omissions relating to market conduct, unfair insurance practices or other professional errors and omissions of Altus.

5.    Unconditionally and irrevocably will indemnify, hold harmless, and reimburse Reliance from and against any and all costs and expenses, including reasonable attorney fees, (other than loss and expense incurred under the coverage terms of a WC Policy) that arise or result from the suspension or termination by any party to the UM Agreement and/or any related third party claims administration agreement that are incurred by Reliance in performing or contracting with a third party (which must be nationally or regionally recognized as competent to perform such services and/or obligations) to perform policy service or claims investigation, adjustment, defense or settlement obligations with respect to the WC Policies after such suspension or termination.

6.    Unconditionally and irrevocably will indemnify, hold harmless, and reimburse Reliance from and against any and all loss from the loss of the time value of money that may be incurred by Reliance by virtue of the failure of Altus to reimburse the Controlled Loss Disbursement Account on the following business day after a disbursement is made from that account which was established under that certain Claims Service Agreement between Altus and Reliance made effective February 1, 1999. The time value of money will be based on Reliance's average return on invested cash and will be measured from the date that Reliance funds are actually drawn from the Controlled Disbursement Account until the date that Reliance is reimbursed for the use of those Reliance funds.

7.    Unconditionally and irrevocably guarantees to Reliance the due and punctual payment (within five (5) business days of written notice of Reliance therefor) of:

    a.    all deductible reimbursement obligations of policyholders under any policy issued with deductible provisions;

    b.    all premium adjustments of retrospective rated or loss sensitive rated policies;

    c.    the full payment by Zurich to Reliance of any fronting fees described on Exhibit A attached hereto as Exhibit A;

    d.    and any costs and expenses incurred by Reliance in enforcing this Guarantee and Indemnification.

PAULA FINANCIAL
GUARANTEE AND INDEMNIFICATION

8.  Waives (i) any right to require Reliance to exhaust remedies against either Altus or Zurich or to take any other action against Altus or Zurich, (ii) any requirement that Reliance file any claim in the event of the insolvency or bankruptcy of Altus or Zurich, (iii) any defenses available to PFC regarding bankruptcy, insolvency or other similar matter, (iv) notice of, or any right to contest the enforceability of this Guarantee and Indemnification based upon, any modification of any agreement that Reliance may have with Altus or Zurich, (v) notice of any default under or breach of any agreement by Altus or Zurich of any agreement Reliance may have with Altus or Zurich, (vi) demand and presentation by Reliance for payment upon Altus or Zurich, (vii) protest, notice of protest and diligence of bringing suit against Altus or Zurich, and (viii) any other defenses available to PFC that are not available to Altus or Zurich. PFC further waives any and all defenses and discharges available to an indemnitor, guarantor, surety or co-obligor as such to the full extent permitted by law.

9.  Agrees that this Guarantee and Indemnification will not be discharged except by complete performance by Altus and Zurich of all of their respective obligations to Reliance arising from any agreements Reliance may have with Altus or Zurich and by PFC of all of its obligations under this Guarantee and Indemnification. In the event that Reliance is required to relinquish or return any payments, in whole or part, which had been previously applied to or retained for application against any obligation under this Guarantee and Indemnification, by reason of a proceeding arising under any applicable bankruptcy or insolvency law, or for any other reason, this Guarantee and Indemnification shall automatically continue to be effective notwithstanding any previous cancellation or release of this Guarantee and Indemnification.

10. Represents and Warrants that as of the date of this Guarantee and Indemnification:

   a.  PFC is a corporation duly organized and is validly existing and in good standing under the laws of the State of Delaware.

   b.  PFC has the corporate power and authority to execute and deliver this Guarantee and Indemnification and to perform its obligations under this Guarantee and Indemnification and to carry out the transactions contemplated by this Guarantee and Indemnification.

   c.  The execution and delivery of this Guarantee and Indemnification and the consummation of the transactions contemplated by this Guarantee and Indemnification have been duly authorized by all necessary corporate action on the part of PFC.

   d.  Upon the execution and delivery of this Guarantee and Indemnification by PFC, this Guarantee and Indemnification shall constitute the legal, valid and binding obligation of PFC enforceable against PFC in accordance with its terms, subject to applicable bankruptcy or similar laws, rules and regulations affecting creditors generally.

   e.  Neither the execution and delivery of this Guarantee and Indemnification by PFC nor the consummation of the transactions contemplated in this Guarantee and Indemnification does or will conflict with or result in a violation or breach of or constitute (with or without notice or lapse of time or both) a default under, or result in a right of termination or acceleration under, or the creation of any lien upon any of the material properties or assets of PFC under, any of the terms, conditions or provisions of any of the following:

      i)   the charter documents or by-laws of PFC;

      ii)  any other agreement or other instrument to which PFC is a party or by which it is bound; or

**PAULA FINANCIAL**
**GUARANTEE AND INDEMNIFICATION**

        iii)    any statute, law, rule, regulation, or judicial, administrative, governmental, regulatory or arbitration order, award, judgment, writ, injunction or decree applicable to PFC or any agreement with any governmental or regulatory authority.

    f.    There are no consents, authorizations, orders, approvals or non-disapprovals of, or filings or registrations with, any governmental department, commission, board, other regulatory authority or third party that are required to be obtained or submitted by PFC prior to the execution and delivery of this Guarantee and Indemnification or the performance and consummation of the transactions contemplated by this Guarantee and Indemnification.

11.    Miscellaneous

    a.    This Guarantee and Indemnification may not be assigned by PFC except with the express written consent of Reliance and shall be binding upon the successors and assigns of PFC.

    b.    This Guarantee and Indemnification shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania (without giving effect to the conflicts of laws principles thereof). If any term of this Guarantee and Indemnification thereof shall be invalid or unenforceable, the remainder of this Guarantee and Indemnification shall remain in full force and effect.

**IN WITNESS WHEREOF,** intending to be legally bound, PFC has executed this Guarantee by its duly authorized officers to be effective March 15, 1999.


PAULA FINANCIAL

By: _____

Name: _____

Title:   **President**


ATTEST:

By: _____

Name: _____

Title:   **Secretary**

# EXHIBIT "C"

# UNDERWRITING MANAGEMENT AGREEMENT

This Agreement is made and entered into this 15th day of March, 1999 by and between Reliance Insurance Company, Reliance National Indemnity Company, United Pacific Insurance Company and Reliance National Insurance Company, ("Company") with principal place of business at Three Parkway, Philadelphia, Pennsylvania 19102 and Altus Insurance Holdings, LLC, ("UM"), a Delaware limited liability Company whose principal place of business is located at Bellevue, Washington.

## WITNESSETH

**WHEREAS,** Company transacts an insurance business in certain states of the United States as an admitted insurer in compliance with the laws and regulations where coverage is being provided; and

**WHEREAS,** UM desires to serve as underwriting manager on behalf of Company for certain classes of business classified as workers' compensation and employers' liability insurance and certain policies issued under the United States Longshore and Harbor Workers' Compensation Act (collectively referred to as the "Program") in all of the states, territories and possessions of the United States where Company may lawfully transact the business of insurance, subject to the territorial limitations set forth in Exhibit A of this Agreement; and

**WHEREAS,** Company desires to engage UM to act as underwriting manager to produce the Program business on the terms and conditions set forth in this Agreement; and

**NOW, THEREFORE,** Company and UM in consideration of the mutual premises herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, agree as follows:

## I.   DEFINITIONS:

As used in this Agreement, UM and Company agree as follows:

A.   <u>Underwriting Guidelines</u> shall include, but not be limited to, Company's underwriting standards, rules   and procedures, manuals setting forth the rates to be charged, approved policy forms and certificates, and the conditions for the acceptance or rejection of risks, subject however to such other applicable law or regulation.

B.   <u>Policy or Policies</u> shall mean all policy or policies, binders, certificates, endorsements and contracts of insurance issued by Company through UM under the Program.

C.   <u>Gross Written Premium</u> shall mean direct written premiums collected by UM on behalf of Company in respect of the Policies, including Policy related fees, any applicable late payment fees or other chargeable and/or due from insureds in respect of all Policies for the account of Company, as a result of business placed with Company by UM, less related amounts of return premiums, cancellation premiums and dividends. Gross Written Premiums shall include no premiums ultimately determined to be uncollectible.

D.   <u>Territory</u> shall mean the jurisdictional limitations set forth in Exhibit A.

## II.   APPOINTMENT

A.       Company hereby appoints UM as its underwriting manager, on a non-exclusive basis, for the production of insurance risks, as described more fully hereinbelow, with such power and authority as is set forth more fully in this Agreement, and within the Territory.

ALTUS-U/W MGMT. AGMT.
3/11/99 1:25 PM



PRIVILEGED

B.     UM hereby accepts such appointment and agrees to comply strictly with all written Underwriting Guidelines as are from time to time established by Company and furnished to UM.

C.     UM hereby agrees that during the term of the Agreement, as a material condition of said appointment, it shall not act as underwriting manager, producer, agent or the like, nor solicit, market, sell or furnish leads to any other insurance carrier in the Territory, as respects the classes of business written pursuant to this Agreement. Further, UM acknowledges that Company has existing relationships with other underwriting managers in place in the Territory, and shall be free to develop such relationships in the Territory or elsewhere where Company is now licensed or may become licensed in the future.

D.     Notwithstanding the foregoing, UM hereby agrees, that if at any time UM seeks to expand its undertaking into any jurisdiction where it does not at this time conduct underwriting operations, UM and Company shall first investigate for their mutual benefit, the opportunity to enter and expand into such jurisdiction.

E.     Notwithstanding anything to the contrary, Company shall retain ultimate control and responsibility of any and all functions that it has delegated to UM pursuant to this Agreement.

## III.    DUTIES OF UM

A. _Underwriting:_ Subject to the terms and conditions of this Agreement, and subject to all applicable laws and regulations, UM shall provide services for Company as follows:

1.    UM shall have authority to solicit, receive, underwrite, bind, accept, non-renew and cancel insurance risks on behalf of Company in accordance with the specific written Underwriting Guidelines attached hereto as _Exhibit B_ and made a part of this Agreement, and as are from time to time established and/or modified by Company, and shall at all times adhere to such Underwriting Guidelines, when considering the placement of any insurance risk.  In conducting such underwriting, UM shall, as appropriate, perform the following administrative services on risks placed with Company under this Agreement:

    a.   UM shall receive and review all applications for insurance consistent with the Underwriting Guidelines.
    b.   If a risk qualifies, UM shall process applications/issue quotes, binders, cover notes, Policies of insurance and certificates of insurance consistent with the Underwriting Guidelines.
    c.   UM shall issue and deliver to qualified insureds the Policy and any endorsements, no more than thirty (30) days following the effective date of coverage or receipt of the requisite premium and any other necessary information, including a duly completed application, or such other shorter period of time as may be dictated by state insurance law, whichever is sooner.  UM shall gather and maintain on behalf of Company such information as is necessary to assure the timely and proper issuance, delivery, execution or countersignature of all Policies, certificates, endorsements and/or binders on such forms as are approved by Company and the appropriate regulatory authority for the business produced under this Agreement.
    d.   UM shall develop and maintain proper underwriting files on behalf of Company, which shall contain at a minimum, such information as is outlined more fully in _Exhibit C_, and in all cases shall contain adequate information to clearly demonstrate the reasons for acceptance or rejection of any risk, and/or the pricing of any risk.

e.  UM shall be responsible for notifying any governmental agency or other persons for whom coverage has been certified or evidence of insurance provided, to the extent so required.

f.  UM may cancel, terminate or otherwise non-renew Policies bound or written under this Agreement as appropriate, consistent with the Underwriting Guidelines and applicable regulatory considerations.  UM may not reinstate cancelled or terminated Policies without the proper written approval of Company, other than Policies cancelled for non-payment of Premium.

g.  UM shall provide proper and timely notice of any cancellation, non-renewal, increase in Premium, or reduction in coverage, to policyholders, certificate holders, loss payee and/or any regulatory authority, as required by the Policy.

h.  UM shall use its reasonable efforts and good faith to achieve an underwriting profit considered in the aggregate, and shall serve Company faithfully and at all times, promote and safeguard Company's best interests with respect to the business place hereunder.

2.  Notwithstanding anything to the contrary, Company shall reserve the right to cancel or non-renew any Policy, consistent with the terms of such Policy, except as limited by any other provision of this Agreement, or applicable insurance law or regulation, and shall provide reasonable notification to UM of any such cancellation or non-renewal.

C.  <u>Authority</u>: UM shall not represent or act on behalf of Company in any other manner, or for any other purpose than is specifically prescribed in this Agreement.  Company hereby grants to UM the authority to utilize only insurance contract wordings, endorsement wordings, and rates that are approved in writing by Company and are properly filed and/or approved, to the extent necessary, by appropriate regulatory authorities.

## IV.    LIMITATIONS OF AUTHORITY

In addition to any other limitations expressly or implicitly contained in this Agreement, any exhibits or addenda thereto, Underwriting Guidelines or any bulletin or instruction which may be issued from time to time by Company to UM, UM shall have no authority to do any of the following acts:

1.  commit Company to participate in insurance or reinsurance syndicates, associations or pools or bind Company to reinsurance agreements or arrangements;

2.  exceed the maximum policy limits established in the Underwriting Guidelines, or in any single calendar year, exceed the maximum annual premium volume permitted by the Underwriting Guidelines, without prior written approval of Company;

3.  extend the time for the payment of premiums or other monies due Company, waive premium payment, withhold any monies or property of Company, or offer or pay any rebate of premium, except as provided in the *Altus Casualty Company Credit Policy*, attached hereto as <u>Exhibit D.</u> UM agrees to advise Company of any changes made to <u>Exhibit D;</u>

4.  directly or indirectly solicit, sell, offer, bind, issue, or deliver any insurance at any reduction or deviation from the rates, Policy forms, endorsements, terms or conditions specified therefor by Company, or deviate in any manner from the Underwriting Guidelines promulgated by Company;

5.  institute, prosecute, defend or maintain any legal proceedings in the name of or on behalf of Company, or in connection with any matter pertaining to Company's business without the prior written consent of Company;

6.  endorse checks payable to Company, except, notwithstanding, UM may endorse checks for deposit into the Premium Fiduciary Account, hereinafter defined;

7.    reinstate Policies or certificates cancelled by Company for other than non-payment of premium without the specific prior written approval of Company;

8.    bind coverage subsequent to the effective date of the Policy without first providing to Company documentation confirming that there are no known or reported losses;

## V.    PREMIUM COLLECTION AND ACCOUNTING

A.    UM shall collect and receive Premiums, any policy related fees, any applicable late payment fees and/or all other sums chargeable and/or due in respect of any and all such Policies, binders, certificates and contracts of insurance on behalf of Company, and pay return premiums and/or other sums due in respect of the Policies. UM shall not charge or collect any other fees in respect of such Policies, except as may be required under applicable insurance law or regulation. UM shall be responsible in a fiduciary capacity for all funds collected and paid on behalf of Company in accordance with applicable insurance laws or regulations of any jurisdiction to which the subject matter of this Agreement may apply. UM agrees to account for and pay to Company or to its order, all balances due to Company, and all premiums, policy fees and late payment fees, and/or other sums due on business placed by UM with Company under this Agreement, whether collectible or uncollectible. Premiums past due and uncollected for a period of 120 days shall be deemed to be uncollectible.

B.    Company and UM acknowledge that the business produced under this Agreement shall be transacted on an agency bill – account current basis. Accordingly, it is agreed that UM shall remit any and all Premiums and other sums due and collected under this Agreement less commissions, and paid losses and allocated loss adjustment expenses reimbursed to the Company's Controlled Loss Disbursement Account by Altus Insurance Holdings, LLC ("Servicing Company") under the Claims Service Agreement between Company and Servicing Company effective March 15th, 1999 to Company no later than fifteen (15) days following the end of the reporting month, regardless of whether such premiums have actually been collected by UM.

C.    UM shall be responsible for collecting all premiums due from Insureds and will retain such premiums in an interest bearing trust account in favor of UM (the "Premium Fiduciary Account") to which Company shall be a named signatory. The deposits of the Premium Fiduciary Account shall be insured by the Bank Insurance Fund or the Savings Associations Insurance Fund of the Federal Deposit Insurance Corporation. UM agrees that the Fiduciary Premium Account shall be maintained separate and apart from any operating or other funds of UM. UM agrees to remit Gross Written Premium to Company no later than fifteen (15) days following the end of the reporting month.

D.    If UM fails to account for, or remit Gross Written Premium when due, or pay monies due to Company, then Company may, by ten (10) days prior written notice to UM to cure such defect, suspend UM's authority under this Agreement or immediately terminate this Agreement. Immediately following the fifteenth (15th) day upon which UM fails to account for or pay monies due to Company, delinquent amounts shall bear compound interest at the prime rate as published by Citibank, N.A., for the first day of the calendar month in which the amount becomes overdue, as published in the Wall Street Journal, plus 2% annum, to the extent permitted by applicable law. Company acknowledges the possibility of legitimate accounting discrepancies and shall, during the aforesaid cure period, permit reasonable discussion relative to any such discrepancy.

## VI.    REPORTING REQUIREMENTS

UM shall provide all accounting and reporting services with respect to this Agreement to satisfy the reasonable requirements of Company, including but not limited to the following:

A.  Within ten (10) days of the end of each reporting month, UM shall submit to Company, in a format set forth in Exhibit E ("Statement of Account") a monthly account itemizing Premiums written and Premium adjustments made, including additional or return Premiums, audit and rate adjustments made with respect to all Program business and transactions in that month.

B.  From time to time, upon the request of Company, UM shall prepare other reports, including electronic file transfers, NCCI bureau reporting, WCIRB reporting, and all unit statistical data to Company's affiliated statistical agent(s), and an audited report of financial examination, in such form as may be reasonably requested by Company.

C.  The UM shall prepare separate monthly statements for each agent on the business placed by the UM through its agent or agents, and furnish the agent with an IRS Form 1099 each year when required.

## VII.  CLAIMS

A.  Company authorizes UM or its designee to investigate adjust, and settle claims with respect to the Program, subject to the discretionary authority limitations contained in a separate Claims Service Agreement executed between Company and UM.

B.  UM agrees that UM or its designee will give prompt and immediate written notice to Company and/or its designee of any claim, demand, action, suit or proceeding raised, brought, threatened, made or commenced against Company that relates to any matter arising out of or under this Agreement and as more fully articulated in the Claims Service Agreement.

C.  UM agrees to cooperate fully in the investigation, adjustment and defense of all claims against Company on Policies issued pursuant to this Agreement.

## VIII.  REGULATORY COMPLIANCE

A.  UM shall have the responsibility of preparing and making filings of insurance rates and forms as may be required by state insurance laws.  UM shall only solicit or write Policies under the Program in accordance with state insurance laws and regulations and only after all necessary insurance rate and form filing approvals, where applicable, have been obtained by Company.

B.  UM shall provide, at its own reasonable expense, and within a reasonable time, as necessary, such information related to the Program business transacted under the authority granted in this Agreement, to satisfy reporting requirements imposed upon Company by any regulatory authority.

C.  UM shall forward to Company no later than the fifth (5th) business day after receipt thereof, any and all notices, complaints and inquires received from any regulatory authority, or any other action or sanction charged against Company.  UM shall take and/or assist in any response as is reasonable and necessary in defense of Company.

D.  UM represents and warrants that it will comply with the requirements of the insurance laws and regulations of the states in which it will operate on behalf of Company and/or in which Company is domiciled.  UM and/or its affiliates and subsidiaries represent and warrant that they are, and will continue to be, during the term of this Agreement, authorized and licensed to transact business as an insurance producer in the manner contemplated by this Agreement to the extent required under applicable law. Further, UM represents and warrants that its affiliates and/or subsidiaries will maintain such individual or corporate licenses as are appropriate and necessary for the proper conduct

of business under this Agreement.  In the event that any license utilized by UM expires, terminates or is suspended for any reason, UM's authority under this Agreement shall be suspended immediately, and Company may avail itself of its rights provided under Article XVII hereunder.

E.   UM shall be responsible for and agrees to pay any fines, damages or penalties levied against Company or UM by any regulatory authority having appropriate jurisdiction, arising out of or related to the business produced or Policies serviced under this Agreement, to the extent and to the degree resulting from any negligent act, error or omission whether intentional or unintentional of UM.

F.   Within six (6) months following execution and delivery of this Agreement, and annually thereafter within one hundred-twenty (120) days of the close of the fiscal year of UM, UM shall deliver to Company an audited financial statement of UM and UM's designated assignee from its certified public accountants and internal auditors with respect to the operation of UM.  UM hereby agrees to provide Company if requested, any and all documentation that may reasonably be necessary to verify the proper handling of any funds under this Agreement.

IX.   **REINSURANCE**

Without the express written direction of Company, UM shall neither negotiate nor bind reinsurance on behalf of Company on any business UM places with Company.

X.   **APPOINTMENT OF AGENTS:**

UM shall not be authorized to delegate any of its authority hereunder, but may, from time to time, appoint lawfully licensed producers, agents or brokers solely for the production of insurance business produced under this Agreement. No such producer, agent or broker shall have or be granted binding authority.

XI.   **Company'S DUTIES:**

Company shall promptly inform UM in writing of all changes to its licenses or Certificates of Authority in the territory relating to the authority of Company to transact the business of insurance under this Agreement.

XII.   **CONFIDENTIAL INFORMATION:**

A.   The parties hereby agree to treat as confidential any and all reports, information, and data relating to, obtained by, prepared or assembled by, or given to the other or developed as a result of information supplied by or on behalf of either party, under this Agreement, or by reason of, or relating to, the transaction contemplated by this Agreement, including but not limited to any materials, presentations, records, and all matters affecting or relating to the proposed business and operations under this Agreement (such information being collectively referred to herein as "Confidential Information").

B.   The parties shall each take appropriate steps to ensure that all Confidential Information is kept confidential by the respective parties and each of their directors, officers, principals, shareholders, employees, agents and advisors, and that such Confidential Information will not be divulged, disclosed or communicated to any person, firm, association, corporation or other entity, during or subsequent to the term of this Agreement, provided, however, that (i) disclosure of any Confidential Information to which the other party has consented in writing may be made; and (ii) any Confidential Information may be disclosed pursuant to applicable law, regulation or legal process; and (iii) Confidential Information may be also disclosed to auditors of either party and regulatory authorities, to the extent that they are required to do so.

C.  In the event of a breach of this Article XII relating to Confidential Information, the affected party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach, which shall not be deemed to be the exclusive remedy for such breach, but shall be in addition to all the remedies available at law or equity.

D.  The term "Confidential Information" as used in this Agreement dosed not include information which (i) was or becomes generally available to the public other than as a result of the disclosure by or on behalf of a party; (ii) was or becomes available on a non-confidential basis from a source other than a party or its representatives, provided that such source is not bound by a confidentiality agreement with, or similar obligation.

## XIII. UM'S UNDERWRITING COMMISSIONS, FEES AND EXPENSES:

A.  UM's Underwriting Commissions, Fees and Expenses – Company will pay UM as sole compensation for the faithful performance of all of its duties and responsibilities under this Agreement and underwriting commission of seven and one-half percent (7.5%) of Gross Net Written Premium received by Company on Policies written under this Agreement. Gross Net Written Premium means gross policy premium less return and refund premiums.

    1.  Sub-Producer Allowance – UM's underwriting commission and fee include allowances to pay a maximum commission due sub-producers of seven and one-half percent (7.5%) of Gross Net Written Premium. Commissions payable to sub-producers are the sole responsibility of the UM.  .

    2.  UM's Fee – Company agrees to pay and UM agrees to accept a fee of one dollar ($1.00) in consideration for faithful performance of all of its duties and responsibilities under this Agreement. The parties acknowledge that this Agreement has been entered into as one of a series of agreements with respect to the Policies and that this consideration is adequate to establish a binding contract between the parties with respect to the subject of this Agreement.

B.  Credit Risk – Premiums ultimately determined to be uncollectible will be borne by UM including control and collection of agents and/or attorney fees.

C.  Return of Commission – In the event of a Policy cancellation or endorsement resulting in a Premium return to a policy holder, UM shall be responsible for refunding to Company the entire amount of any commission paid or allowed on the returned Premium.

D.  Expenses – UM shall be responsible for all expenses incurred by UM in the performance of its obligations under this Agreement, including but not limited to rentals, transportation facilities, office upkeep, remuneration of officers, clerks, employees, or other representatives, postage, promotional and advertising expenses, stationary, printing, policy administration and attendant expenses, bank charges, countersignatures, agent commissions, fees to any third party claims administrator, motor vehicle reports, investigations, premium taxes, guaranty fund or regulatory assessments, residual market loads, cost of excess reinsurance, board and bureau expenses, any index bureau expenses, license expenses, costs of policyholders premium audits conducted, costs of any actuarial reviews conducted, rate filings and all overhead and other expenses of whatever nature, whether billed to Company or to UM. UM acknowledges, that from time to time, Company may be required to remit payment for certain of the above-referenced Expenses on behalf of UM. In such instances, Company shall promptly forward to UM any invoice sent to Company for payment of expenses incurred by Company on behalf of UM. Upon receipt of any such invoice, UM agrees to reimburse Company within ten (10) business days. In addition, UM shall be responsible for all benefits, labor, social security

obligations, and immigration reporting requirements, of its personnel, whether or not related to Company's business. The conduct by UM of its business shall be at its own and sole cost, credit, risk and expense.

XIV.    **BOOKS AND RECORDS:**

A.    UM shall maintain at its own expense, complete, accurate and up-to-date separately identifiable books and records and electronic files with respect to the insurance risks covered hereunder, and in support of accounting and reporting requirements set forth above, (hereinafter collectively referred to as "Books and Records"), as required by statute. All Books and Records are required to be maintained by UM under this Agreement, in hard copy form, microfilm, computer software systems and/or other generally accepted information storage medium, as well as, in any reasonable back-up form directed by Company for the period described above. To the extent practicable, utilizing its best efforts, UM shall establish, and shall have in place within a reasonable time subsequent to the commencement of any activity under this Agreement, (i) one or more computer link(s) with Company, and /or its designated representatives, to facilitate the automatic transfer of data regarding Policies issued under this Agreement; and (ii) a disaster recovery plan, the purpose of which is to protect all Books and Records required to be maintained by UM under this Agreement, from any catastrophe, disaster, calamity, unforeseen occurrence, Act of God, or the like.

B.    Company, or its designee, shall have broad authority to inspect, copy and audit all Books and Records at any time during reasonable business hours, and may make copies or extracts thereof as it may deem necessary. All Books and Records relating to the risks placed under this Agreement, in whatever information storage medium they are maintained, are the property of Company. In the event of termination of this Agreement, at the direction of Company, UM must forward to Company copies of all Books and Records, without expense to Company. UM shall at all times make available and permit access to the Commissioner of Insurance, or his or her duly designated authorized representative, all Books and Records in a form usable to the commissioner. In the event of termination of this Agreement, upon reasonable notice to Company, Company shall permit UM to inspect, copy and audit all Books and Records at Company's principal place of business. Any copies or extracts shall be with Company's permission and at the UM's cost.

XV.    **EXPIRATIONS:**

A.    Company acknowledges that the expiration rights and records associated with the business produced under this Agreement and placed with Company are the sole property of UM. However, Company has the right to inspect, access, or audit any information, which relates to the Program business produced under this Agreement, at any time, during the term of this Agreement upon reasonable notice to UM. The parties obligation not to disclose or use any such Confidential Information survives the termination of this Agreement.

B.    If this agreement is terminated and UM has not properly accounted for or paid all premiums owed to Company as set forth in Article V, Company shall give UM fifteen (15) days written notice of its intent to assume the expiration rights pertaining to the Program business after which Company shall have the sole right to use and control such expiration rights to the extent of UM's obligation to Company, unless Company agrees in writing (which shall not be unreasonably withheld by Company) that UM has cured such improper accounting and/or premium payment shortage within the fifteen (15) day notice period.

XVI.    **ADVERTISEMENT:**

UM shall not use advertising material, prospectus, proposal, or representation, either in general or in relation to a particular Policy of Company or use its name or the name of any of its affiliates or associated companies, unless furnished by Company or until the consent of Company thereto in writing shall have first been secured

03/19/9910:08 AM                                                                                                8

for each and any such usage. Such approval shall not in any event be construed as charging or binding Company to bear any part of the cost or expenses thereof. UM shall not issue or circulate, or cause to be issued or circulated, any illustration, circular, statement or memorandum of any sort misrepresenting the terms, benefits, or advantages of any Policy issued by Company or make any misleading statement as to the financial security of Company.

## XVII.  COMMENCEMENT AND TERMINATION:

A.  Term: This Agreement shall remain in full force and effect for a period of twelve (12) months from the date of execution of this Agreement, and shall expire on March 15, 2000, unless otherwise terminated as provided herein.

B.  Company may terminate this Agreement without cause by providing UM with 90 (ninety) days prior written notice specifying the effective date of the termination. Any such termination shall not affect the rights and obligations of the parties hereto as to transactions, acts, or things done by either party prior to the effective date of termination.

C.  Company reserves the right to reasonably modify the authority granted to UM upon thirty (30) day's notice to UM. Any such modification shall not affect the rights UM as to transactions or acts done by prior to the effective date of such modification.

D.  Computer Data:

1.  Upon termination of this Agreement, and/or the UM's inability to administer the run-off business produced under this Agreement, UM shall immediately provide Company with a tape back-up of all software programs and data libraries, including update source code and data files, used in the production ad administration of business hereunder (the "Data").

2.  The UM hereby grants, at no cost to Company, a limited license to Company to use the UM's software, together with the source and object code for such software, as well as all necessary manuals, immediately upon delivery of the data to Company as provided in the preceding paragraph unless restricted by the licensor.

3.  For any and all software used or employed in connection with the UM's responsibilities under this Agreement, UM agrees to assign its title to Company, as may reasonably required by Company for the administration of the run-off business.

4.  UM's obligations under this Article XVI (D) shall be limited to the extent that UM's ability authorized to provide Company with such access is not restricted under its contracts with third party software vendors.

E.    Company may terminate this Agreement immediately for cause, upon occurrence of any of the following; provided, however, except as to subsections 2, 5, 6, for which Company shall provide written notice, and three (3) business days opportunity to cure:

1. If UM, any regulated affiliated Company or subsidiary, is or becomes insolvent, or is the subject of or commences any regulatory or judicial or other proceedings for the administrative oversight, conservation, supervision, dissolution, liquidation, bankruptcy, receivership or the like;

2. If, for whatever reason, UM does not commence fulfillment of duties provided in this Agreement or once having commenced its duties, engages in neglect of its duties and obligations hereunder, fails or refuses to act to carry out its duties and obligations hereunder;

3. If UM has taken any action or failed to comply with any law or regulation, the ultimate result of which UM should have known would cause any governmental or regulatory agency or authority to revoke or suspend the authority of, or place under any supervision or cease and desist order, UM, its parent Company, any affiliated Company or subsidiary, or Company, that Company believes in its reasonable discretion, the effect of which has, or would likely have a materially adverse impact on Company's interest;

4. If any required license or authority of UM or of any key personnel, or producers and/or agents, in any jurisdiction within the Territory covered by this Agreement becomes invalid or expires and is not renewed without any lapse, or if any license or authority of UM or of any key personnel is revoked or suspended by governmental or regulatory agency or authority; .

5. If UM, any of its directors, officers or principals, is the subject of an indictment, or criminal investigation, shall have committed any fraudulent act or criminal conduct, has had a conviction brought against him or it, which Company in its reasonable discretion determines adversely reflects on the integrity or trustworthiness of such entity or person; or .

6. If Steve Clark or Ed Lopit, whom the parties recognize and agree are key personnel at UM, shall cease to actively participate in the direction and/or administration of UM, the effect of which Company believes has or would likely have a materially adverse impact on Company's interests in this Agreement.

7. The inability of the Company to obtain or maintain in force reinsurance satisfactory to the Company in all terms and conditions for the policies subject to this Agreement. Company shall have sole responsibility to seek and obtain reinsurance.

F. UM may immediately terminate this Agreement upon the occurrence of any or all of the following:

1. If Company institutes or acquiesces in the institution of any bankruptcy, reorganization or liquidation proceeding, or any such proceeding is instituted against Company and remains undismissed for thirty (30) days;

2. If, for whatever reason, Company does not commence fulfillment of duties provided in this Agreement or once having commenced its duties, engages in neglect of its duties and obligations hereunder, fails or refuses to act to carry out its duties and obligations hereunder;

3. If Company has taken any action or failed to comply with any law or regulation, the ultimate result of which Company should have known would cause any governmental or regulatory agency or authority to revoke or suspend the authority of, or place under any supervision or cease and desist order Company, its parent Company, any affiliated Company or subsidiary, or UM, that UM believes in its reasonable discretion, the effect of which has, or would likely have a materially adverse impact on UM's interest;

4. If any required license or authority of Company or of any key personnel in any jurisdiction within the Territory covered by this Agreement becomes invalid or expires and is not renewed without any lapse, or if any license or authority of Company or of any key personnel is revoked or suspended by governmental or regulatory agency or authority; or

5. If Company, any of its directors, officers or principals, is the subject of an indictment, or criminal investigation, shall have committed any fraudulent act or criminal conduct, has had a conviction brought against him or it, which UM in its reasonable discretion determines adversely reflects on the integrity or trustworthiness of such entity or person.

G. In the event of proper termination of this Agreement:

1. All obligations of the parties under this Agreement shall survive until discharged and shall be discharged promptly.

2. No party shall have a claim upon the other for loss of prospective profit or damage to the business arising therefrom.

3. Company may, in its sole discretion, require the UM to run-off the in-force business to normal expiration in accordance with the provisions of this Agreement. The UM shall bear all expenses of the run-off operations.

4. The UM shall upon demand return to Company any Policies, forms or other supplies imprinted with either Company's name, or any forms or other supplies furnished to the UM by the Company.

5. Company may, in its sole discretion, suspend the underwriting authority of the UM during the pendency of any dispute regarding the cause for termination.

## XVIII. INDEPENDENT CONTRACTOR:

Nothing herein contained shall be construed to create a relationship of employer and employee between Company and UM, or between Company and any of UM's employees, officers, representatives, producers, agents, brokers, sub-producers, sub-agents, sub-brokers or the like. It is the express intent of the parties hereto that UM is not an employee of Company for any purpose, but rather UM is an independent contractor. Further, it is expressly understood and agreed by the parties hereto that the relationship existing between Company and UM under this Agreement constitutes UM and Company's proxy or representative only in connection with the services or transactions set forth in this Agreement and directly related to UM's functions under this Agreement.

## XVIX. INDEMNIFICATION

A. Each party as indemnitor ("Indemnitor") shall indemnify and hold harmless the other party and their respective directors, officers, employees, shareholders, and affiliates as indemnitee ("Indemnitee") from and against any and all loss, cost, claim, damage, liability, expenses, suit, fines, penalties, including punitive or exemplary damages and all cost of defense (or any action in respect thereof) which is caused by or results from any malfeasance, negligence, action or inaction of Indemnitor and its officers, directors, employees, and agents of its duties and obligations under this Agreement. If any claim, demand, action, suit, or proceeding is made or brought against Indemnitee with respect to matters that are the subject of this indemnity, Indemnitor shall assume the defense thereof with counsel reasonably satisfactory to the Indemnitee and shall pay all costs of such defense. The Indemnitee shall decide in its sole discretion whether claims or suits against it may be settled, and will enlist the advice and participation of the other party in such matters. The duties, obligations and liabilities of the parties hereunder and the provisions of this Article XVIX Indemnification, shall survive the termination of this Agreement.

B. <u>Errors and Omissions</u> – UM represents and warrants that it now has, and shall maintain during the term of this Agreement, insurance coverage for Errors and Omissions Liability in an amount of at least $5,000,000 each occurrence, and at least $5,000,000 in the aggregate, with an insurer that is acceptable to Company and on a form and with a deductible reasonably satisfactory to Company. UM shall provide Company with a Certificate of Insurance in its name evidencing the existence of such coverage and identifying Company as an additional insured. Such Certificate of Insurance shall contain the following statement "Company shall receive thirty (30) days written notice of any change, cancellation or other termination of this Errors and Omissions liability Policy."

C. <u>Fidelity Bond</u> - UM represents and warrants that it now has, and shall maintain during the term of this Agreement, a Fidelity Bond covering all operations, employees and subcontractors servicing the business of this Agreement, in an amount of at least $1,000,000, with an insurer that is acceptable to Company and on a form and with a deductible reasonably satisfactory to Company. UM shall provide Company with a Certificate of Insurance for such coverage with the same provisions as provided for in the Errors and Omissions coverage evidencing the existence of such coverage.

## XX.    <u>FIDUCIARY RESPONSIBILITIES</u>

UM shall maintain a sufficient staff of competent and trained personnel and adequate supplies and equipment to perform its duties under this Agreement. UM shall undertake to perform its obligations faithfully as a fiduciary and shall use its reasonable efforts to serve Company faithfully at all times and to promote and safeguard Company's best interest and to perform all acts necessary for the proper conduct of the business on behalf of Company and in full compliance with the applicable laws and regulations.

## XXI.    <u>YEAR 2000</u>

A. UM hereby represents and warrants to Company that, to its knowledge, the management information systems (including all computer hardware and software) owned, licensed, leased or otherwise utilized by UM, and its affiliates, are free of any material problem, infirmity or defect as respects the "Year 2000 Problem" and/or any "9/9/99 Problem" such that the management information systems do not and will not, without requiring any material modifications, (1) experience any malfunctions or other usage problem or failure in connection with the year 2000 and subsequent years as distinct from the 1900 years, or relating to improper expirations, terminations or data loss on or following September 9, 1999; or (2) result in any loss or liability sustained in connection with: (a) the rendering of date or time sensitive data, including but not limited to the recording, storing, processing, calculating, comparing, sequencing or presenting by electronic means of calendar dates or spans of time from, into and between the twentieth and twenty-first centuries (including leap year calculations); and (b) the generation, transmission, delivery, receipt of and any use or reliance on information or calculations dependent of or relating to calendar dates or spans of time from, into and between the twentieth and twenty-first centuries (including leap year calculations) (the "Y2K Problem").

B. To the extent practicable, at its own expense, UM shall use commercially reasonable efforts to uncover any Y2K Problem in the management information systems (including all computer hardware and software) owned, licensed, leased or otherwise utilized by UM and its affiliates, during the Term of this Agreement. UM will provide Company with prompt written notice of any such Y2K Problem in such management information systems of which it becomes aware, and will use commercially reasonable efforts to address and/or correct any material problem, infirmity or defect as respects any such Y2K Problem as soon as practicable after its discovery.

## XXII.    <u>NOTICE</u>

Any notice required under this Agreement must be in writing and either sent by certified mail or personally delivered. If sent by certified mail, notice shall be effective upon postmarking by the Postal Service. If personally delivered, notice shall become effective upon delivery to the other party. Unless changed, the addresses of the respective parties are.

If to UM:

Altus Insurance Holdings, LLC
600 108th Avenue, N.E., Ste. 522
Bellevue, Washington 98004

If to: Company:

Reliance Insurance Company
Three Parkway
Philadelphia, PA 19102
Attn: Legal Department
FAX: 215/864-4141

## XXIII. INTEGRATION & AMENDMENT:

This Agreement constitutes the entire Agreement between Company and UM (excluding the Claims Administration Agreement executed between the parties) and supersedes any and all other agreements, either oral or written, between Company and UM with respect to the Program business. No amendment to this Agreement will be effective unless made in writing and signed by the parties hereto.

## XXIV. REMEDIES NOT EXCLUSIVE:

No right to remedy set forth in this Agreement is exclusive of any other right or remedy, but shall be in addition to every other right and remedy given under this Agreement or existing now or hereafter at law or equity.

## XXV. SEVERABILITY:

Whenever possible, each provision of this Agreement will be interpreted in such manner and to such an extent as to be effective and valid under applicable law. If any provision is prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity.

## XXVI. APPLICABLE LAW:

This Agreement shall be interpreted in accordance with the laws of the State of Pennsylvania.

## XXVII. WAIVER:

The failure of any party to enforce any provision of this Agreement shall not constitute a waiver by either party of any such provision. The past waiver of a provision by any party shall not constitute a course of conduct or a waiver in the future to the same provision.

## XXVIII. ASSIGNMENT:

This Agreement may not be assigned without the express written consent of Company; provided however that UM's rights and obligations hereunder will be assigned to Altus Casualty Company, Ltd., a Bermuda Company, upon submission and approval by Company of all applicable licenses and/or other documentation relating to the formation of Altus Casualty Company, Ltd., as may be reasonably requested by Company.

## XXIX. COUNTERPARTS:

This Agreement may be executed in any number of counterparts, all of which when taken together shall constitute a single agreement.

## XXX. OFFSET

Any payment that either party may be contractually obligated to pay to the other under this Agreement shall be paid after deducting any amount which is then due and unpaid under this Agreement or any other agreement between the parties.

## XXXI. HEADINGS

All Headings in this Agreement are for the purpose of information and identification only and shall not be construed as forming part of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date and year first above written.

Witness:

RELIANCE INSURANCE COMPANY
RELIANCE NATIONAL INDEMNITY COMPANY
UNITED PACIFIC INSURANCE COMPANY
RELIANCE NATIONAL INSURANCE COMPANY

BY: _____

TITLE: _____

Witness:

ALTUS INSURANCE HOLDINGS, LLC

BY: _____

TITLE: VP Operations

03/19/99 10:08 AM

14

**EXHIBIT A**

**Territory**

The power and authority of UM to operate on behalf of Company under this Agreement is hereby limited to the following jurisdictions: Alaska, Louisiana and Washington.

**Lines/Class of Insurance Business**

The UM's authority to operate under this Agreement on behalf of Company shall be limited strictly to the following classifications of insurance business:

Statutory Workers' Compensation Cover A,
One Million ($1,000,000) BI Each Accident, One Million ($1,000,000 ) by Disease Policy Limit, One Million ($1,000,000) Each Employee, Coverage B, Stop Gap Liability Coverage
One Million ($1,000,000) BI Each Accident, One Million ($1,000,000) BI by Disease Each Employee
One Million $1,000,000) BI by Disease Policy Limit
United States Longshore and Harbor Workers' Act
Jones Act

**EXHIBIT B**

**Underwriting Guidelines**

Those on file with ZCIC under their Underwriting Management Agreement with Altus
Insurance Holdings, LLC effective February 1, 1999.

## EXHIBIT C

## Format of Underwriting File

In accordance with the terms of the Agreement, UM must maintain an Underwriting File on each account. Such Underwriting File may be maintained electronically, and typically will include, at a minimum, the following sections and information:

**Coverage document/policy section:**
Policy
Endorsements
Renewals
Non Renewals notices
Cancellations notices

**Correspondence section:**
Declinations
Quotes
Binders
Lost policy releases
All general correspondence

**Underwriting section:**
Submission (application, loss runs)
Rating worksheets
Risk management (i.e. central analysis bureau, loss control, etc.)
Financial statements
Underwriting worksheets and final disposition

**Loss notices & reports section:**
Loss notices
Claims correspondence (legal, adjusters correspondence etc.)
Copy of notice to Company

**Billing Information section:**
Billing notices
Payment history

## EXHIBIT D

**Altus Casualty Company Credit Policy**

The objective of the Altus Casualty credit policy is to enhance cash flow and to provide flexible credit terms to our policyholders while eliminating or at least reducing exposure to bad debts.

We will have two primary systems of collection. These are agency bill for accounts produced direct for an agent and direct bill for those accounts written through our wholesale broker Penhurst, for their sub-brokers.

Altus will principally utilize direct bill on all accounts produced through the Penhurst Wholesale Agency Agreement. Agency bill collections will be discouraged but may be necessary on certain accounts. If Agency bill collections will be discouraged but may be necessary on certain accounts. If Agency bill is selected, all installments must be paid on the due date indicated in the policy. Altus will not accept payment on an account current format from any agent.

Direct billed accounts will be written on an installment basis or by a payroll reporting, stipulating the actual payroll incurred for the period being billed. Those accounts utilizing the payroll reporting method for payment will be billed as stated in the appropriate section below.

## INSTALLMENT PAY

The following procedures will govern all direct bill policies where the insured pays in installments.

- When the policy is written, a premium installment schedule will be sent to the insured and/or incorporated into the policy by endorsement. A deposit premium will be collected based on the Deposit Premium section below (Example: 10 installments require 10% of the annual premium).

- Insured will remit the first installment to Altus in the amount stated in the policy within five days of binding coverage. Additional installments will be paid within 5 days of each date specified in the policy.
- If the premium is not received by the 10th of the month as stipulated in the schedule in the policy, notice of cancellation will be sent. Reinstatement is subject to the appropriate sections below.

## PAYROLL REPORTED POLICIES

The following procedures will govern all payroll reported policies.

- When the policy is written, all periods or payroll reports will be sent to the insured. These could be monthly, quarterly or semiannually. A deposit premium will be collected based on the Deposit Premium section below.
- By the 5th of the month following the end of the period to be paid, the insured will fill out the appropriate payroll, multiply it by the rate per hundred, multiply it by the appropriate modifiers and attach a check for the amount and return to us.

- If the payroll report and check are not received by the 10th of the month, a reminder notice will be sent.
- If the payroll report and check is not received by the 20th of the month, the policy will be cancelled and subject to the cancellation/reinstatement policy below.

## CANCELLATION/REINSTATEMENT POLICY

The following procedure will govern the cancellation and reinstatement of all policies. The underwriters will have full authority to operate within these procedures and exceptions will be made by the Underwriting Vice President in consultation with the Controller. The Chief Financial Officer will be the final authority if there is further dispute.

- We will allow 3 cancellations and reinstatements on the first 2 if the money is received within the cancellation period.
- The policy will not be reinstated after the third cancellation without the above approvals.

## DEPOSIT PREMIUMS

Deposit premiums for payroll report accounts are based on the following schedule unless there are state exceptions which must be charged.

- Monthly/payroll reports – 20% of the estimated annual premium
- Quarterly payroll reports – 35% of the estimated annual premium
- Semi-annual payroll reports – 60% of the estimated annual premium

## PAYROLL CHECKING FOR INSTALLMENT BILLINGS

In some instances of possible fluctuating payroll, the underwriter may determine that payroll reports shall be received from the insured to verify the accuracy of the estimated premium and determine if enough money has been collected in the installments. This can be on a monthly, quarterly or semi-annual basis. The underwriter will base this decision on the possible change of the insured in operations, eliminating or adding jobs, payroll shifts or any other circumstance that can be expected.

## CREDIT REPORTS OR ANALYSIS

The financial strength of a prospective policyholder is an important component in the underwriter's decision to choose a specific premium plan. Loss sensitive plans may create additional credit risk to the insurer that will need to be mitigated through deposits and/or collateral.

All guaranteed cost plans under $100,000 manual premium will not have credit reports. All loss sensitive plans and accounts $100,000 or over will have credit reports and an analysis by the financial department on all accounts over $500,000 premium. This

analysis may include audited/reviewed financial statements as determined by Altus Controller.

## FINANCIAL SECURITY-COLLATERAL

Depending on the credit rating of the insured and the type of plan written, security may be required on loss sensitive plans. This security may take the form of additional premiums/deposits collected or Letter of Credit.

# EXHIBIT "D"

## WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY INFORMATION PAGE

ICW1950507

Renewal of NEW

UNITED PACIFIC INSURANCE COMPANY

(Name of Insurer)                           NCCI #: 11312

Fein No. 64-0900067                         Issuing Office __PHILADELPHIA, PA__

1. **The Insured/Mailing Address:** (No. Street, Town, County, State, Zip)    Agency Code, Name and Address

FRIEDE GOLDMAN HALTER, INC
13085 SEAWAY ROAD
GULFPOINT, MS 39503

70112 PENHURST INSURANCE SERVICES
2481 CONGRESS STREET
SAN DIEGO, CA 92110

Other Workplaces not shown above:

☐ INDIVIDUAL ☐ PARTNERSHIP ☒ CORPORATION
OR _____
I.D. No. _____TBD_____

2. **Policy Period:** The policy period is from    3/15/00  to    3/15/01         12:01 A.M. Standard Time,
   at the Insured's Mailing Address.

3. **Coverage:**

   A. Workers Compensation Insurance: Part One of the policy applies to the Workers Compensation Law of the states
   listed here: FL LA MN MS TX

   B. Employer's Liability Insurance: Part Two of the policy applies to work in each state listed in item 3.A.
   The limits of our liability under Part Two are:

   |                          |    |           |               |
   |--------------------------|----|-----------|---------------|
   | Bodily Injury by Accident| $  | 1,000,000 | each accident |
   | Bodily Injury by Disease | $  | 1,000,000 | each employee |
   | Bodily Injury by Disease | $  | 1,000,000 | policy limit  |

   C. Other States Insurance: Part Three of the policy applies to the states, if any, listed here:
   All states except North Dakota, Ohio, Washington, West Virginia, Wyoming, States designated in item 3.A above and

   D. This policy includes these endorsements and schedules: SEE SCHEDULE OF FORMS AND ENDORSEMENTS

4. **Premium:** The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating
   Plans. All information required below is subject to verification and change by audit.

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated annual Premium |
|-----------------|----------|---------------------------------------------------|-------------------------------|--------------------------|
| SEE WC 174      |          |                                                   |                               |                          |

Surcharge: TX      0.00

|                                                                              |    |                |
|------------------------------------------------------------------------------|----|----------------|
| Total premium subject to the experience modification                         | $  | 19,755,067.00  |
| Premium modified to reflect experience modification of __SEE SCHED.__        | $  | 19,755,067.00  |
| Other _____SEE SCHED.____                                             | $  | 10,553,825.00- |
| Total Estimated Standard Premium                                             | $  | 9,201,242.00   |
| Premium Discount, if applicable, _____N/A_____ % $                         |    |                |
| Loss and/or Expense Constant Charge                                          | $  | 200.00         |
| Minimum Premium   $ _____0_____   Total Estimated Annual Premium        | $  | 9,201,442.00 MP|

If indicated below, interim adjustments of premium shall be made
☐ Semi-Annually ☐ Quarterly ☐ Monthly  Deposit Premium $ ____306,698____

Countersigned Date ___8/30/00___  By Authorized Representative _____
   ISSUE DATE:    8/30/00

THIS INFORMATION PAGE WITH THE WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY AND ENDORSEMENTS, IF
ANY, ISSUED TO FORM A PART THEREOF, COMPLETES THE ABOVE NUMBERED POLICY.

CJDL-6400 Ed. 4/84
WC 00 N009 02 0799          Copyright 1987 National Council on Compensation Insurance          WC 00 00 01A

## Workers Compensation and Employers Liability Insurance - Change Endorsement

| UNITED PACIFIC INSURANCE COMPANY | | * * EFFECTIVE | |
|---|---|---|---|
| POLICY NUMBER | POLICY PERIOD | | AGENCY NUMBER |
| ICW1950507 | FROM: 3/15/00    TO: 3/15/01 | | 70112 |

| NAME OF INSURED AND ADDRESS | AGENCY NAME AND ADDRESS |
|---|---|
| FRIEDE GOLDMAN HALTER, INC<br>13085 SEAWAY ROAD<br>GULFPOINT, MS  39503 | PENHURST INSURANCE SERVICES<br>2481 CONGRESS STREET<br>SAN DIEGO, CA  92110 |

WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY CHANGE ENDORSEMENT

CHANGE ENDORSEMENT NUMBER   A

<u>SCHEDULE OF FORMS AND ENDORSEMENTS</u>                    Page   1

| RN00U00100 | 5/93 | IN WITNESS PAGE |
|---|---|---|
| WC000000A | 4/92 | WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSUR. POLICY |
| WC990600 | 1/92 | ENDT#  1  PAYROLL REPORTING SCHEDULE ENDORSEMENT |
| WC990600 | 1/92 | ENDT#  2  IN REM ENDORSEMENT |
| WC990600 | 1/92 | ENDT#  3  DEATH ON THE HIGH SEAS ENDORSEMENT |
| WC990600 | 1/92 | ENDT#  4  GULF OF MEXICO EXTENSION ENDORSEMENT |
| WC990600 | 1/92 | ENDT#  5  RETROSPECTIVE PREMIUM ENDORSEMENT RATING OPTION V –<br>ONE YEAR PLAN |
| WC00N00502 | 8/98 | DEDUCTIBLE ENDORSEMENT |
| WC00R01200 | 3/94 | CANCELLATION BY US |
| WC000106A | 11/95 | LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT COVERAGE<br>ENDORSEMENT |
| WC000109A | 4/92 | OUTER CONTINENTAL SHELF LANDS ACT COVERAGE ENDORSEMENT |
| WC000201A | 4/92 | MARITIME COVERAGE ENDORSEMENT |
| WC000301A | 2/89 | ALTERNATE EMPLOYER ENDORSEMENT |

Cont'd on Page  2

THIS ENDORSEMENT CHANGES THE POLICY TO WHICH IT IS ATTACHED AND IS EFFECTIVE ON THE DATE
ISSUED UNLESS OTHERWISE STATED.

(THE INFORMATION BELOW IS REQUIRED ONLY WHEN THIS ENDORSEMENT IS ISSUED SUBSEQUENT TO
PREPARATION OF THE POLICY.)

Premium $

Countersigned by Authorized Representative _George Alan Gilder_ _____ Date _____

WC 99 06 00 0192

## Workers Compensation and Employers Liability Insurance - Change Endorsement

| UNITED PACIFIC INSURANCE COMPANY | | * * EFFECTIVE | |
|---|---|---|---|
| **POLICY NUMBER** | **POLICY PERIOD** | | **AGENCY NUMBER** |
| ICW1950507 | FROM: 3/15/00    TO: 3/15/01 | | 70112 |

NAME OF INSURED AND ADDRESS
FRIEDE GOLDMAN HALTER, INC
13085 SEAWAY ROAD
GULFPOINT, MS  39503

AGENCY NAME AND ADDRESS
PENHURST INSURANCE SERVICES
2481 CONGRESS STREET
SAN DIEGO, CA  92110

WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY CHANGE ENDORSEMENT

CHANGE ENDORSEMENT NUMBER    A

SCHEDULE OF FORMS AND ENDORSEMENTS                              Page    2

| WC000313 | 4/84 | WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT |
|---|---|---|
| WC000404 | 4/84 | PENDING RATE CHANGE ENDORSEMENT |
| WC000414 | 7/90 | NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT |
| WC000503A | 9/91 | RETROSPECTIVE PREMIUM ENDORSEMENT–ONE YEAR PLAN |
| WC090606 | 10/98 | FLORIDA EMPLOYMENT AND WAGE INFORMATION RELEASE ENDORSEMENT |
| WC170601B | 12/99 | LOUISIANA AMENDATORY ENDORSEMENT |
| WC170602A | 2/96 | LOUISIANA COST CONTAINMENT ACT ENDORSEMENT |
| WC220601B | 7/97 | MINNESOTA CANCELATION AND NONRENEWAL ENDORSEMENT |
| WC420301F | 1/00 | TEXAS AMENDATORY ENDORSEMENT |
| WC420304A | 1/00 | TEXAS WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT |
| GU7966a | 5/59 | COUNTERSIGNATURE ENDORSEMENT |

THIS ENDORSEMENT CHANGES THE POLICY TO WHICH IT IS ATTACHED AND IS EFFECTIVE ON THE DATE ISSUED UNLESS OTHERWISE STATED.

(THE INFORMATION BELOW IS REQUIRED ONLY WHEN THIS ENDORSEMENT IS ISSUED SUBSEQUENT TO PREPARATION OF THE POLICY.)

Premium $

Countersigned by Authorized Representative _George Van Gelder_ _____ Date _____

WC 99 06 00 0192



IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the company.

**United Pacific Insurance Company**
HOME OFFICE-PHILADELPHIA, PENNSYLVANIA
(A STOCK INSURANCE COMPANY)

Secretary

President

RN 00 U001 00 0593
ILBP 83 01 11 88 UP                ICW1950507        3/15/00

WC 102
(4-92)

WC 00 00 00 A (Ed. 4-92)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

## PLEASE READ THE POLICY CAREFULLY.

### QUICK REFERENCE

| | BEGINNING ON PAGE |
|---|---|
| INFORMATION PAGE | |
| GENERAL SECTION | 1 |
| A. The Policy | 1 |
| B. Who Is Insured | 1 |
| C. Workers' Compensation Law | 1 |
| D. State | 1 |
| E. Locations | 1 |
| PART ONE—WORKERS' COMPENSATION INSURANCE | |
| A. How This Insurance Applies | 1 |
| B. We Will Pay | 1 |
| C. We Will Defend | 1 |
| D. We Will Also Pay | 1 |
| E. Other Insurance | 1 |
| F. Payments You Must Make | 1 |
| G. Recovery From Others | 2 |
| H. Statutory Provisions | 2 |
| PART TWO—EMPLOYERS' LIABILITY INSURANCE | |
| A. How This Insurance Applies | 2 |
| B. We Will Pay | 2 |
| C. Exclusions | 2 |
| D. We Will Defend | 3 |
| E. We Will Also Pay | 3 |
| F. Other Insurance | 3 |

| | BEGINNING ON PAGE |
|---|---|
| G. Limits Of Liability | 3 |
| H. Recovery From Others | 3 |
| I. Actions Against Us | 3 |
| PART THREE—OTHER STATES INSURANCE | 4 |
| A. How This Insurance Applies | 4 |
| B. Notice | 4 |
| PART FOUR—YOUR DUTIES IF INJURY OCCURS | 4 |
| PART FIVE—PREMIUM | 4 |
| A. Our Manuals | 4 |
| B. Classifications | 4 |
| C. Remuneration | 4 |
| D. Premium Payments | 4 |
| E. Final Premium | 4 |
| F. Records | 4 |
| G. Audit | 5 |
| PART SIX—CONDITIONS | 5 |
| A. Inspection | 5 |
| B. Long Term Policy | 5 |
| C. Transfer Of Your Rights And Duties | 5 |
| D. Cancelation | 5 |
| E. Sole Representative | 5 |

IMPORTANT:

This Quick Reference is not part of the Workers' Compensation and and Employers' Liability Insurance Policy and does not provide coverage. Refer to the Workers' Compensation and Employers' Liability Insurance Policy itself for actual contractual provisions.

ICW1950507     3/15/00

Copyright 1991 National Council on Compensation Insurance.

## WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

In return for the payment of the premium and subject to all terms of this policy, we agree with you as follows.

### GENERAL SECTION

**A. The Policy**

This policy includes at its effective date the Information Page and all endorsements and Schedules listed there. It is a contract of insurance between you (the employer named in Item 1 of the Information Page) and us (the insurer named on the Information Page). The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.

**B. Who Is Insured**

You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees.

**C. Workers' Compensation Law**

Workers' Compensation Law means the workers' or workmen's compensation law and occupational disease law of each state or territory named in Item 3.A of the Information Page. It includes any amendments to that law which are in effect during the policy period. It does not include any federal workers' or workmen's compensation law, any federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

**D. State**

State means any state of the United States of America, and the District of Columbia.

**E. Locations**

This policy covers all of your workplaces listed in Items 1 or 4 of the Information Page; and it covers all other workplaces in Item 3.A states unless you have other insurance or are self-insured for such workplaces.

### PART ONE — WORKERS' COMPENSATION INSURANCE

**A. How This Insurance Applies**

This workers' compensation insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. Bodily injury by accident must occur during the policy period.

2. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

**B. We Will Pay**

We will pay promptly when due the benefits required of you by the workers' compensation law.

**C. We Will Defend**

We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance. We have the right to investigate and settle these claims, proceedings or suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

**D. We Will Also Pay**

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend:

1. reasonable expenses incurred at our request, but not loss of earnings;

2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the amount payable under this insurance;

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

**E. Other Insurance**

We will not pay more than our share of benefits and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that may apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance will be equal until the loss is paid.

**F. Payments You Must Make**

You are responsible for any payments in excess of the benefits regularly provided by the workers' compensation law including those required because:

1. of your serious and willful misconduct;

2. you knowingly employ an employee in violation of law;

3. you fail to comply with a health or safety law or regulation; or

4. you discharge, coerce or otherwise discriminate against any employee in violation of the workers'

Copyright 1991 National Council on Compensation Insurance.

compensation law.

If we make any payments in excess of the benefits regularly provided by the workers' compensation law on your behalf, you will reimburse us promptly.

### G. Recovery From Others

We have your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

### H. Statutory Provisions

These statements apply where they are required by law.

1. As between an injured worker and us, we have notice of the injury when you have notice.

2. Your default or the bankruptcy or insolvency of you or your estate will not relieve us of our duties under this insurance after an injury occurs.

3. We are directly and primarily liable to any person

entitled to the benefits payable by this insurance. Those persons may enforce our duties; so may an agency authorized by law. Enforcement may be against us or against you and us.

4. Jurisdiction over you is jurisdiction over us for purposes of the workers' compensation law. We are bound by decisions against you under that law, subject to the provisions of this policy that are not in conflict with that law.

5. This insurance conforms to the parts of the workers' compensation law that apply to:

    a. benefits payable by this insurance;

    b. special taxes, payments into security or other special funds, and assessments payable by us under that law.

6. Terms of this insurance that conflict with the workers' compensation law are changed by this statement to conform to that law.

Nothing in these paragraphs relieves you of your duties under this policy.

## PART TWO — EMPLOYERS' LIABILITY INSURANCE

### A. How This Insurance Applies

This employers' liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must arise out of and in the course of the injured employee's employment by you.

2. The employment must be necessary or incidental to your work in a state or territory listed in item 3.A of the Information Page.

3. Bodily injury by accident must occur during the policy period.

4. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

5. If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.

### B. We Will Pay

We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers' Liability Insurance.

The damages we will pay, where recovery is permitted by law, include damages:

1. for which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third

party as a result of injury to your employee;

2. for care and loss of services; and

3. for consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee;

provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you; and

4. because of bodily injury to your employee that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

### C. Exclusions

This insurance does not cover:

1. liability assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner;

2. punitive or exemplary damages because of bodily injury to an employee employed in violation of law;

3. bodily injury to an employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your executive officers;

4. any obligation imposed by a workers' compensation, occupational disease, unemployment compensation or disability benefits law or any similar law;

5. bodily injury intentionally caused or aggravated by you;

6. bodily injury occurring outside the United States of America, its territories or possessions and Can-

ada. This exclusion does not apply to bodily injury to a citizen or resident of the United States of America or Canada who is temporarily outside these countries;

7. damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions;

8. bodily injury to any person in work subject to the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950), the Non-appropriated Fund Instrumentalities Act (5 USC Sections 8171-8173), the Outer Continental Shelf Lands Act (43 USC Sections 1331-1356), the Defense Base Act (42 USC Sections 1651-1654), the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942), any other federal workers' or workmen's compensation law or other federal occupational disease law, or any amendments to these laws;

9. bodily injury to any person in work subject to the Federal Employers' Liability Act (45 USC Sections 51-60), any other federal laws obligating an employer to pay damages to an employee due to bodily injury arising out of or in the course of employment, or any amendments to those laws;

10. bodily injury to a master or member of the crew of any vessel;

11. fines or penalties imposed for violation of federal or state law; and

12. damages payable under the Migrant and Seasonal Agricultural Worker Protection Act (29) USC Sections 1801-1872) and under any other federal law awarding damages for violation of those laws or regulations issued thereunder, and any amendments to those laws.

**D.  We Will Defend**

We have the right and duty to defend, at our expense, any claim, proceeding or suit against you for damages payable by this insurance. We have the right to investigate and settle these claims, proceedings and suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance. We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.

**E.  We Will Also Pay**

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend:

1. reasonable expenses incurred at our request, but not loss of earnings;

2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the limit of our liability under this insurance;

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

**F.  Other Insurance**

We will not pay more than our share of damages and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

**G.  Limits Of Liability**

Our liability to pay for damages is limited. Our limits of liability are shown in item 3.B of the Information Page. They apply as explained below.

1. Bodily Injury by Accident. The limit shown for "bodily injury by accident—each accident" is the most we will pay for all damages covered by this insurance because of bodily injury to one or more employees in any one accident.

   A disease is not bodily injury by accident unless it results directly from bodily injury by accident.

2. Bodily Injury by Disease. The limit shown for "bodily injury by disease—policy limit" is the most we will pay for all damages covered by this insurance and arising out of bodily injury by disease, regardless of the number of employees who sustain bodily injury by disease. The limit shown for "bodily injury by disease—each employee" is the most we will pay for all damages because of bodily injury by disease to any one employee.

   Bodily injury by disease does not include disease that results directly from a bodily injury by accident.

3. We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

**H.  Recovery From Others**

We have your rights to recover our payment from anyone liable for an injury covered by this insurance. You will do everything necessary to protect those rights for us and to help us enforce them.

**I.  Actions Against Us**

There will be no right of action against us under this insurance unless:

1. you have complied with all the terms of this policy; and

2. the amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability. The bankruptcy or insolvency of you or your estate will not relieve us of our obligation under this Part.

**ICW1950507         3/15/00**

Copyright 1991 National Council on Compensation Insurance.

WC 102 (4-92)
WC 00 00 00 A (Ed. 4-92)

## PART THREE — OTHER STATES INSURANCE

### A. How This Insurance Applies

1. This other states insurance applies only if one or more states are shown in Item 3.C of the Information Page.

2. If you begin work in any one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as though that state were listed in Item 3.A of the Information Page.

3. We will reimburse you for the benefits required by the workers' compensation law of that state if we are not permitted to pay the benefits directly to persons entitled to them.

4. If you have work on the effective date of this policy in any state not listed in Item 3.A of the Information Page, coverage will not be afforded for that state unless we are notified within thirty days.

### B. Notice

Tell us at once if you begin work in any state listed in Item 3.C of the Information Page.

## PART FOUR — YOUR DUTIES IF INJURY OCCURS

Tell us at once if injury occurs that may be covered by this policy. Your other duties are listed here.

1. Provide for immediate medical and other services required by the workers' compensation law.

2. Give us or our agent the names and addresses of the injured persons and of witnesses, and other information we may need.

3. Promptly give us all notices, demands and legal papers related to the injury, claim, proceeding or suit.

4. Cooperate with us and assist us, as we may request, in the investigation, settlement or defense of any claim, proceeding or suit.

5. Do nothing after an injury occurs that would interfere with our right to recover from others.

6. Do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

## PART FIVE — PREMIUM

### A. Our Manuals

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

### B. Classifications

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

### C. Remuneration

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1. all your officers and employees engaged in work covered by this policy; and

2. all other persons engaged in work that could make us liable under Part One (Workers' Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2. will not apply if you give us proof that the employers of these persons lawfully secured their workers' compensation obligations.

### D. Premium Payments

You will pay all premium when due. You will pay the premium even if part or all of a workers' compensation law is not valid.

### E. Final Premium

The premium shown on the Information Page, Schedules and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise.

1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short rate cancelation table and procedure. Final premium will not be less than the minimum premium.

### F. Records

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

**G. Audit**

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

PART SIX — CONDITIONS

**A. Inspection**

We have the right, but are not obliged to inspect your workplaces at any time. Our inspections are not safety inspections. They relate only to the insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards. Insurance rate service organizations have the same rights we have under this provision.

**B. Long Term Policy**

If the policy is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force.

**C. Transfer Of Your Rights And Duties**

Your rights or duties under this policy may not be transferred without our written consent.

If you die and we receive notice within thirty days after your death, we will cover your legal representative as insured.

**D. Cancelation**

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancelation is to take effect.

2. We may cancel this policy. We must mail or deliver to you not less than ten days advance written notice stating when the cancelation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancelation notice.

4. Any of these provisions that conflicts with a law that controls the cancelation of the insurance in this policy is changed by this statement to comply with that law.

**E. Sole Representative**

The insured first named in Item 1 of the Information Page will act on behalf of all insureds to change this policy, receive return premium and give or receive notice of cancelation.

WC 174
(4-84)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE
## POLICY EXTENSION OF INFORMATION PAGE

Policy Number:  ICW1950507          3/15/00                                    Page      1

4.  Premium

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| FLORIDA | | | | |
| FRIEDE GOLDMAN HALTER, INC | | | | |
| WAIVER OF SUBROGATION ADDITIONAL PREMIUM | 0930 | | | 0 |
| SHIP BUILD. IRON OR STEEL-NOC & DRVRS-COVER UNDER U.S. ACT | 6843F | IF ANY | 29.1400 | 0 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | IF ANY | .5900 | 0 |
| | | | | 0 |
| EL 1000/1000/1000 WITH WC | 9812 | | 3.3000% | 0 |
| | | | | 0 |
| 250,000 LG DEDUCTIBLE CREDIT-APPLIED AFTER EXPERIENCE RATED | 9862 | | | 0 |
| | | | | 0 |
| EXPENSE CONSTANT | 0900 | | | 200 |
| | | | | 200 |
| Total Estimated Annual Premium $ | | | | |

Cont'd on Page      2

WC 174
(4-84)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY EXTENSION OF INFORMATION PAGE

Policy Number:  ICW1950507          3/15/00                          Page      2

4.  Premium

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| LOUISIANA | | | | |
| FRIEDE GOLDMAN HALTER, INC | | | | |
| DIFFERENCE BETWEEN STANDARD & FINAL PREMIUM | 0056 | | | 206,036 |
| WAIVER OF SUBROGATION ADDITIONAL PREMIUM | 0930 | | | 140,428 |
| IRON OR STEEL: IRON OR STEEL-WORKS-SHOP-STRUCTURAL & DRIVER | 3030 | 1,923,475 | 15.1800 | 291,984 |
| MACHINE SHOPS NOC. | 3632 | 37,089 | 5.5800 | 2,070 |
| MILLWRIGHT WORK-NOC & DRIVERS | 3724F | 115,200 | 24.5500 | 28,282 |
| MILLWRIGHT WORK-NOC & DRIVERS | 3724 | IF ANY | 9.0600 | 0 |
| SHIP BUILD. IRON OR STEEL-NOC & DRVRS-COVER UNDER U.S. ACT | 6843F | 11,467,571 | 21.8200 | 2,502,224 |
| SHIP REPAIR OR CONVERSION-ALL OPER &DRVRS-COVER UNDER US ACT | 6872F | 11,158,914 | 36.8800 | 4,115,407 |
| VESSELS-NOC-PROGRAM I | 7016F | 26,675 | 21.1400 | 5,639 |
| DRIVERS,CHAUFFEURS AND THEIR HELPERS NOC-COMMERCIAL | 7380 | 42,146 | 7.3200 | 3,085 |
| STORAGE WAREHOUSE - NOC | 8292 | 30,528 | 8.8800 | 2,711 |
| ENGINEER OR ARCHITECT CONSULTING | 8601F | IF ANY | 4.3600 | 0 |
| Total Estimated Annual Premium $ | | | | |

Cont'd on Page      3

WC 174
(4-84)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE
## POLICY EXTENSION OF INFORMATION PAGE

Policy Number:  ICW1950507          3/15/00                                Page      3

4.  Premium

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| LOUISIANA  (CONT'D) | | | | |
| FRIEDE GOLDMAN HALTER, INC | | | | |
| ENGINEER OR ARCHITECT CONSULTING | 8601 | 726,656 | 1.6100 | 11,699 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 6,365,158 | .4400 | 28,007 |
| BUILDINGS-OPERATION BY OWNER OR LESSEE | 9015 | 101,150 | 6.0400 | 6,109 |
| AIRCRAFT OPERATION REPORT PASS ENGER SEAT SURCH AND CRASH LOS | 9108 | 24 | 1.0000 | 2,400 |
| STREET CLEANING & DRIVERS | 9402 | 238,494 | 10.1400 | 24,183 |
| | | | | ———————— |
| | | | | 7,370,264 |
| EL 1000/1000/1000 WITH WC | 9812 | | 2.8000% | 196,599 |
| | | | | ———————— |
| | | | | 7,566,863 |
| SCHEDULE RATE CREDIT | 9887 | | .7500 | 1,891,116- |
| | | | | ———————— |
| | | | | 5,675,747 |
| 250,000 LG DEDUCTIBLE CREDIT- APPLIED AFTER EXPERIENCE RATED | 9862 | | | 1,968,757- |
| | | | | ════════ |
| | | | | 3,706,990 |
| Total Estimated Annual Premium $ | | | | |

Cont'd on Page      4

WC 174
(4-84)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY EXTENSION OF INFORMATION PAGE

Policy Number: ICW1950507          3/15/00                                    Page     4

4. Premium

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| MINNESOTA | | | | |
| FRIEDE GOLDMAN HALTER, INC | | | | |
| WAIVER OF SUBROGATION ADDITIONAL PREMIUM | 0930 | | | 270 |
| ENGINEER OR ARCHITECT CONSULTING | 8601 | 233,280 | 1.0100 | 2,356 |
| SALESPERSONS, COLLECTORS OR MESSENGERS-OUTSIDE | 8742 | 84,096 | .7400 | 622 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 5,018,112 | .2100 | 10,538 |
| | | | | 13,786 |
| EL 1000/1000/1000 WITH WC | 9812 | | 2.8000% | 378 |
| | | | | 14,164 |
| 250,000 LG DEDUCTIBLE CREDIT- APPLIED AFTER EXPERIENCE RATED | 9862 | | | 5,066– |
| | | | | 9,098 |
| REQUIRED TO BALANCE TO RISK MINIMUM PREMIUM | 0990 | | | 399 |
| | | | | 9,497 |
| Total Estimated Annual Premium $ | | | | |

Cont'd on Page     5

WC 174
(4-84)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE
# POLICY EXTENSION OF INFORMATION PAGE

Policy Number: ICW1950507        3/15/00                                    Page    5

### 4.   Premium

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| MISSISSIPPI | | | | |
| FRIEDE GOLDMAN HALTER, INC | | | | |
| DIFFERENCE BETWEEN STANDARD & FINAL PREMIUM | 0056 | | | 202,311 |
| WAIVER OF SUBROGATION ADDITIONAL PREMIUM | 0930 | | | 137,889 |
| GEAR MFG OR GRINDING | 3635 | 501,631 | 1.7600 | 8,829 |
| OIL OR GAS LEASE WORK NOC- BY CONTRACTORS-& DRIVERS | 6216 | IF ANY | 6.5900 | 0 |
| OIL RIG BUILDING-MOBILE OFFSHORE JACKUP TYPE & DRIVERS | 6829F | 64,461,933 | 3.2700 | 2,107,905 |
| SHIP BUILD. IRON OR STEEL-NOC & DRVRS-COVER UNDER U.S. ACT | 6843F | 33,051,064 | 14.3000 | 4,726,302 |
| VESSELS-NOC-PROGRAM II-USL ACT | 7047F | 3,328 | 27.0200 | 899 |
| AIRCRAFT OR HELICOPTER OPER- BUSINESS USE-FLYING CREW | 7421F | 44,160 | 8.9600 | 3,957 |
| POLICE OFFICERS & DRIVERS | 7720 | 89,506 | 2.4400 | 2,184 |
| SALESPERSONS, COLLECTORS OR MESSENGERS-OUTSIDE | 8742 | 589,746 | .7300 | 4,305 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 12,929,980 | .3100 | 40,083 |
| | | | | 7,234,664 |
| EL 1000/1000/1000 WITH WC | 9812 | | 2.8000% | 193,045 |
| **Total Estimated Annual Premium $** | | | | |

Cont'd on Page    6

WC 174
(4-84)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE
## POLICY EXTENSION OF INFORMATION PAGE

Policy Number:  ICW1950507          3/15/00                                    Page      6

4.  Premium

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| MISSISSIPPI  (CONT'D) | | | | |
| FRIEDE GOLDMAN HALTER, INC | | | | |
| | | | | ---------------- |
| | | | | 7,427,709 |
| SCHEDULE RATE CREDIT | 9887 | | .7500 | 1,856,927- |
| | | | | ---------------- |
| | | | | 5,570,782 |
| 250,000 LG DEDUCTIBLE CREDIT-<br>APPLIED AFTER EXPERIENCE RATED | 9862 | | | 1,938,075- |
| | | | | =============== |
| | | | | 3,632,707 |
| **Total Estimated Annual Premium $** | | | | |

Cont'd on Page      7

WC 174
(4-84)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE
## POLICY EXTENSION OF INFORMATION PAGE

Policy Number: ICW1950507            3/15/00                    Page      7

4.  Premium

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| TEXAS | | | | |
| FRIEDE GOLDMAN HALTER, INC | | | | |
| SHIP BUILDING-IRON OR STEEL-NO C & DRIVERS | 6843F | 1,440,000 | 8.0600 | 116,064 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 3,215,620 | .4500 | 14,470 |
| SHIP REPAIR OR CONVERSION-ALL OPERATIONS- & DRIVERS | 6872F | 26,080,000 | 16.6500 | 4,342,320 |
| SALESPERSONS, COLLECTORS OR MESSENGERS - OUTSIDE | 8742 | 163,648 | .8800 | 1,440 |
| DIFFERENCE BETWEEN STANDARD & FINAL PREMIUM | 0056 | | | 93,065 |
| WAIVER OF SUBROGATION ADDITIONAL PREMIUM | 0930 | | | 89,486 |
| | | | | ---------------- |
| | | | | 4,656,845 |
| EL 1000/1000/1000 WITH WC | 9812 | | 2.0000% | 89,486 |
| | | | | ---------------- |
| | | | | 4,746,331 |
| SCHEDULE RATE CREDIT | 9887 | | .6000 | 1,898,533- |
| | | | | ---------------- |
| | | | | 2,847,798 |
| 250,000 LG DEDUCTIBLE CREDIT- APPLIED AFTER EXPERIENCE RATED | 9861 | | | 995,750- |
| | | | | ================ |
| | | | | 1,852,048 |
| **Total Estimated Annual Premium $** | | | | |

Cont'd on Page     8

WC 174
(4-84)

# WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE
## POLICY EXTENSION OF INFORMATION PAGE

Policy Number: ICW1950507         3/15/00                          Page     8

4.  Premium

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| TEXAS  (CONT'D) | | | | |
| FRIEDE GOLDMAN HALTER, INC | | | | |
| TEXAS WC MAINTENANCE TAX SURCHARGE (.000%) | | | | .00 |
| | | Total Estimated Annual Premium $ | | |

## Workers Compensation and Employers Liability Insurance - Change Endorsement

| UNITED PACIFIC INSURANCE COMPANY | | | * * EFFECTIVE | 3/15/00 |
|---|---|---|---|---|
| **POLICY NUMBER** | **POLICY PERIOD** | | | **AGENCY NUMBER** |
| ICW1950507 | FROM:    3/15/00 | TO:    3/15/01 | | 70112 |

NAME OF INSURED AND ADDRESS

FRIEDE GOLDMAN HALTER, INC
13085 SEAWAY ROAD
GULFPOINT, MS 39503

AGENCY NAME AND ADDRESS
PENHURST INSURANCE SERVICES
2481 CONGRESS STREET
SAN DIEGO, CA 92110

WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY CHANGE ENDORSEMENT

CHANGE ENDORSEMENT NUMBER        1
                    PAYROLL REPORTING SCHEDULE
                    ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY TO WHICH IT IS ATTACHED AND IS EFFECTIVE ON THE DATE ISSUED UNLESS OTHERWISE STATED.

(THE INFORMATION BELOW IS REQUIRED ONLY WHEN THIS ENDORSEMENT IS ISSUED SUBSEQUENT TO PREPARATION OF THE POLICY.)

Premium $                                                                                                    Page    1

Countersigned by Authorized Representative _George Man Felden_                    8/30/00
                                                                                                                            Date

WC 99 06 00 0192

## Workers Compensation and Employers Liability Insurance - Change Endorsement

| UNITED PACIFIC INSURANCE COMPANY | | | * * EFFECTIVE | 3/15/00 |
|---|---|---|---|---|

| POLICY NUMBER | POLICY PERIOD | | | AGENCY NUMBER |
|---|---|---|---|---|
| ICW1950507 | FROM: 3/15/00 | TO: 3/15/01 | | 70112 |

NAME OF INSURED AND ADDRESS

FRIEDE GOLDMAN HALTER, INC
13085 SEAWAY ROAD
GULFPOINT, MS 39503

AGENCY NAME AND ADDRESS
PENHURST INSURANCE SERVICES
2481 CONGRESS STREET
SAN DIEGO, CA 92110

WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY CHANGE ENDORSEMENT

CHANGE ENDORSEMENT NUMBER    2
                    IN REM ENDORSEMENT


WE AGREE THAT ANY ACTION "IN REM" AGAINST ANY VESSEL OWNED, OPERATED BY OR
FOR, OR CHARTERED BY OR FOR YOU SHALL IN ALL RESPECTS BE TREATED IN THE SAME
MANNER AS THOUGH THE ACTION WERE "IN PERSONAM" AGAINST YOU.


THIS ENDORSEMENT CHANGES THE POLICY TO WHICH IT IS ATTACHED AND IS EFFECTIVE ON THE DATE
ISSUED UNLESS OTHERWISE STATED.

(THE INFORMATION BELOW IS REQUIRED ONLY WHEN THIS ENDORSEMENT IS ISSUED SUBSEQUENT TO
PREPARATION OF THE POLICY.)

Premium $                                                                        Page   1

Countersigned by Authorized Representative _____   Date  8/30/00 _____

WC 99 06 00 0192

### Workers Compensation and Employers Liability Insurance - Change Endorsement

| UNITED PACIFIC INSURANCE COMPANY | | | * * EFFECTIVE | 3/15/00 |
|---|---|---|---|---|
| **POLICY NUMBER** | **POLICY PERIOD** | | | **AGENCY NUMBER** |
| ICW1950507 | FROM: 3/15/00 | TO: 3/15/01 | | 70112 |

NAME OF INSURED AND ADDRESS

FRIEDE GOLDMAN HALTER, INC
13085 SEAWAY ROAD
GULFPOINT, MS 39503

AGENCY NAME AND ADDRESS
PENHURST INSURANCE SERVICES
2481 CONGRESS STREET
SAN DIEGO, CA 92110

WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY CHANGE ENDORSEMENT

CHANGE ENDORSEMENT NUMBER      3
                              DEATH ON THE HIGH SEAS
                              ENDORSEMENT

IT IS AGREED THAT SUCH INSURANCE AS PROVIDED UNDER ENDORSEMENT WC 00 02 01A-
MARITIME COVERAGE ENDORSEMENT APPLIES TO THE LIABILITY OF THE INSURED UNDER
THE DEATH ON THE HIGH SEAS ACT.

THIS ENDORSEMENT CHANGES THE POLICY TO WHICH IT IS ATTACHED AND IS EFFECTIVE ON THE DATE
ISSUED UNLESS OTHERWISE STATED.

(THE INFORMATION BELOW IS REQUIRED ONLY WHEN THIS ENDORSEMENT IS ISSUED SUBSEQUENT TO
PREPARATION OF THE POLICY.)

Premium $                                                                    Page   1

Countersigned by Authorized Representative _____   8/30/00
                                                                      Date _____

WC 99 06 00 0192

## Workers Compensation and Employers Liability Insurance - Change Endorsement

| UNITED PACIFIC INSURANCE COMPANY | | * * EFFECTIVE | 3/15/00 |
|---|---|---|---|
| POLICY NUMBER | POLICY PERIOD | | AGENCY NUMBER |
| ICW1950507 | FROM:    3/15/00     TO:    3/15/01 | | 70112 |

NAME OF INSURED AND ADDRESS

FRIEDE GOLDMAN HALTER, INC
13085 SEAWAY ROAD
GULFPOINT, MS 39503

AGENCY NAME AND ADDRESS
PENHURST INSURANCE SERVICES
2481 CONGRESS STREET
SAN DIEGO, CA 92110

WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY CHANGE ENDORSEMENT

CHANGE ENDORSEMENT NUMBER      4

GULF OF MEXICO EXTENSION
ENDORSEMENT

IT IS UNDERSTOOD AND AGREED, THAT, AS RESPECTS TO INSURANCE AFFORED BY THIS
POLICY, THE TERRITORIAL LIMITS OF THE UNITED STATES OF AMERICA (AS SET FORTH
IN THE INSURING AGREEMENTS) SHALL INCLUDE THAT PORTION OF THE GULF OF MEXICO
LOCATED BETWEEN THE SHORELINE OF THE UNITED STATES OF AMERICA AND A STRAIGHT
LINE DRAWN FROM A POINT 15 MILES SOUTH OF BROWNSVILLE, TEXAS TO NAPLES,
FLORIDA.

THIS ENDORSEMENT CHANGES THE POLICY TO WHICH IT IS ATTACHED AND IS EFFECTIVE ON THE DATE
ISSUED UNLESS OTHERWISE STATED.

(THE INFORMATION BELOW IS REQUIRED ONLY WHEN THIS ENDORSEMENT IS ISSUED SUBSEQUENT TO
PREPARATION OF THE POLICY.)

Premium $                                                                                          Page   1

Countersigned by Authorized Representative _____     Date   8/30/00 _____

WC 99 06 00 0192

## Workers Compensation and Employers Liability Insurance - Change Endorsement

* * EFFECTIVE

| POLICY NUMBER | POLICY PERIOD | | AGENCY NUMBER |
|---|---|---|---|
| ICW1950507 | FROM: 03/15/00 | TO: 03/15/01 | 70112 |

NAME OF INSURED AND ADDRESS

FRIEDE GOLDMAN HALTER, INC.
P.O. BOX 43
PASCAGOULA, MS  39568

AGENCY NAME AND ADDRESS

70112  PENHURST INSURANCE SERVICES
2481 CONGRESS STREET
SAN DIEGO, CA  92110

WORKER'S COMPENSATION AND EMPLOYER' LIABILITY INSURANCE POLICY CHANGE ENDORSEMENT

CHANGE ENDORSEMENT NUMBER

### RETROSPECTIVE PREMIUM ENDORSEMENT
### RATING OPTION V – ONE YEAR PLAN

### AMENDMENT OF RETROSPECTIVE
### PREMIUM STANDARD ELEMENTS AND DEFINITIONS

The Retrospective Premium Endorsement of the Policy is amended to read:

Paragraph A  Retrospective Premium Standard Elements

1.  Standard Premium is the premium we charge during the rating period for our excess of loss coverage and our expenses.  The estimated standard premium of the policy is $3,680,377.

    The excess of loss coverage provided shall be for any loss or allocated loss adjustment expenses in excess of 60% of premium earned as determined by the Company, as detailed in the Workers' Compensation and Employers' Liability Insurance policy deductible endorsement made part of the policy (paragraph 3c).  Standard Premium does not include the expense constant or premium discount.

2.  The loss conversion factors of the Retrospective Premium Endorsement Rating Option V – One Year Plan; (page 3) paragraph 3 are amended to read:

    Minimum Retrospective Excess of Loss Premium Factor    .70
    Maximum Retrospective Excess of Loss Premium Factor    1.30

THIS ENDORSEMENT CHANGES THE POLICY TO WHICH IT IS ATTACHED AND IS EFFECTIVE ON THE DATE ISSUED UNLESS OTHERWISE STATED.

(THE INFORMATION BELOW IS REQUIRED ONLY WHEN THIS ENDORSEMENT IS ISSUED SUBSEQUENT TO PREPARATION OF THE POLICY.)

Premium $

Countersigned by Authorized Representative _____Date_____

WC 99 06 00 0192

# WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY DEDUCTIBLE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" is to be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on      3/15/00      (Date) at 12:01 A.M. standard time, forms a part of
Policy No.   ICW1950507       of the

UNITED PACIFIC INSURANCE COMPANY
(Name of Insurance Company)

issued to      FRIEDE GOLDMAN HALTER, INC
             (Named Insured)

_____
Authorized Representative

We agree with you as follows:

1.      This agreement is between you and us. It does not change the rights of others under the Policy.

2.      This endorsement applies only to those states shown in the Schedule below or to Part Three - Other States Insurance, if applicable.

3.      We will pay and you will reimburse us for the payments we make on your behalf for benefits under Part One - Workers Compensation Insurance or damages under Part Two - Employers Liability Insurance or benefits under Part Three - Other States Insurance up to the following Deductible Amounts:

     a)    $    250,000       each accident for benefits or damages because of bodily injury by accident, or

     b)    $    250,000       each employee for benefits or damages because of bodily injury by disease.

4.      You will also pay for "Allocated Loss Adjustment Expenses" as part of any claim, proceeding or suit we defend, as indicated by one of the options below:

     ☒      Option I - Allocated Loss Adjustment Expenses Are Included in the Deductible Amount. Your total payments for benefits, damages and Allocated Loss Adjustment Expenses under this option cannot exceed the Deductible Amount for any one accident or any one employee.

     ☐      Option II - Allocated Loss Adjustment Expenses Are Payable In Addition to the Deductible Amount on a Pro-Rata Basis. You must pay Allocated Loss Adjustment Expenses in the proportion that benefits or damages within the deductible amount bear to the total of all benefits or damages paid by us. Your total payments for benefits, damages and Allocated Loss Adjustment Expenses under this option may exceed the Deductible Amount.

     ☐      Option III - Allocated Loss Adjustment Expenses Are Payable In Addition to the Deductible Amount and Are Your Full Responsibility. You must pay all Allocated Loss Adjustment Expenses attributed to all benefits or damages payable by us. Your total payments for benefits, damages and Allocated Loss Adjustment Expenses under this option may exceed the Deductible Amount.

     ☐      Option IV - Allocated Loss Adjustment Expenses Are Payable by Us. We will pay all Allocated Loss Adjustment Expenses attributed to all benefits and damages payable by us. Your total payments for benefits and damages under this option will not exceed the Deductible Amount.

5.      You will also pay an Unallocated Loss Adjustment Expenses fee of   N/A _____
     for any payments we make on your behalf under items 3 and 4 above or item 9 below.

WC 99 06 27b
WC 00 N005 02 0898

6.  You will reimburse us for any assessments that we may incur based upon the total deductible amount related to this endorsement.

7.  Definitions:

    a.  "Allocated Loss Adjustment Expenses" shall mean such claim adjustment expenses directly allocated by us to a particular claim. Such expense shall include, but shall not be limited to, attorney's fees for claims in suit, court and other specific items of expense, such as medical examination, expert medical or other testimony, medical cost containment expenses, laboratory and x-ray, autopsy, stenographic, witnesses and summonses, and copies of documents, but does not include Unallocated Loss Adjustment Expenses.

    b.  "Unallocated Loss Adjustment Expenses" are the cost of investigation, administration, adjustment, settlement or defense of any claim or suit by our salaried employees or independent adjusters.

8.  With respect to Part Two - Employers' Liability Insurance, the terms of the Policy, including those with respect to (a) our right and duty with respect to the defense of suits and (b) your duties in the event of any injury, apply irrespective of the application of any Deductible Amount. The applicable limits of liability shall be reduced by the amount of any damages within any Deductible Amount.

9.  We may pay, at our sole discretion, any Deductible Amount or Allocated Loss Adjustment Expenses to effect settlement of any claim or suit and you shall reimburse us for any sums we may have paid.

10. If we require collateral or other security to secure deductible amounts and other obligations under this endorsement, you shall provide such collateral or other security in an amount and form as we may determine.

11. Upon notification of payment by us, you will promptly reimburse us for any such amounts that we have paid. If you fail to reimburse us, or fail to provide us with any security or collateral in an amount or form as we may require, we may treat such failure as non-payment of premium and we may, at our option, cancel this Policy by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect. Any resulting return premium may be applied to the reimbursement amounts due.

12. We may mutually agree upon a final payment amount to satisfy your present and future payment obligations under this endorsement. Payment by you of such amount will end your obligations to make payments to us under this endorsement.

13. All the terms and conditions of the Policy which are not inconsistent with this endorsement continue to apply.

## SCHEDULE

State(s) to which this endorsement applies:

ALL STATES

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CANCELLATION BY US

This endorsement modifies insurance provided under the following:

**WORKERS' COMPENSATION & EMPLOYERS' LIABILITY INSURANCE POLICY**

Number of Days _____30_____

The cancellation condition of the policy is replaced by this condition:

D. Cancellation

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2. We may cancel this policy. If we cancel because you fail to pay all premium when due or you fail to report payroll when due, we will mail or deliver to you not less than 10 days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we will mail or deliver to you not less than the number of days shown above advance written notice stating when the cancellation is to take effect. Mailing notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancellation notice.

4. Any of these provisions that conflicts with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with the law.

ICW1950507        3/15/00

WC 00 R012 00 0394

WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

WC 00 01 06 A

# LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT COVERAGE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on        3/15/00                    at 12:01 A.M. standard time, forms a part of
                                      (DATE)

Policy No.    ICW1950507              of the        UNITED PACIFIC INSURANCE COMPANY

                                                    (NAME OF INSURANCE COMPANY)

Issued to    FRIEDE GOLDMAN HALTER, INC

Premium (if any) $ INCLUDED                    _____
                                                            Authorized Representative

This endorsement applies only to work subject to the Longshore and Harbor Workers' Compensation Act in a state shown in the Schedule. The policy applies to that work as though that state were listed in Item 3.A. of the Information Page.

General Section C. Workers' Compensation Law is replaced by the following:

C.  Workers' Compensation Law

Workers' Compensation Law means the workers or workmen's compensation law and occupational disease law of each state or territory in Item 3.A. of the Information Page and the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950). It includes any amendments to those laws that are in effect during the policy period. It does not include any other federal workers or workmen's compensation law, other federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

Part Two (Employers Liability Insurance), C. Exclusions., exclusion 8., does not apply to work subject to the Longshore and Harbor Workers' Compensation Act.

This endorsement does not apply to work subject to the Defense Base Act, the Outer Continental Shelf Lands Act, or the Nonappropriated Fund Instrumentalities Act.

## Schedule

| State | Longshore and Harbor Workers' Compensation Act Coverage Percentage |
|---|---|

FL 295.0%   LA 171.0%   MN  58.0%   MS 190.0%   TX  61.0%

The rates for classifications with code numbers not followed by the letter "F" are rates for work not ordinarily subject to the Longshore and Harbor Workers' Compensation Act. If this policy covers work under such classifications, and if the work is subject to the Longshore and Harbor Workers' Compensation Act, those non-F classification rates will be increased by the Longshore and Harbor Workers' Compensation Act Coverage Percentage filed by the insurance company.

WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

WC 421
(4-92)

WC 00 01 09 A (Ed. 4-92)

# OUTER CONTINENTAL SHELF LANDS ACT COVERAGE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on      3/15/00      at 12:01 A.M. standard time, forms a part of

(DATE)

Policy No. ICW1950507    of the      UNITED PACIFIC INSURANCE COMPANY

(NAME OF INSURANCE COMPANY)

issued to FRIEDE GOLDMAN HALTER, INC

Premium $    INCLUDED

_____

Authorized Representative

This endorsement applies only to the work described in Item 4 of the Information Page or in the Schedule as subject to the Outer Continental Shelf Lands Act. The policy will apply to that work as though the location shown in the Schedule were a state named in Item 3.A of the Information Page.

General Section C. Workers' Compensation Law is replaced by the following:

**C. Workers' Compensation Law**

Workers' Compensation Law means the workers' or workmen's compensation law and occupational dis-ease law of each state or territory named in Item 3.A of the Information Page and the Outer Continental Shelf Lands Act (43 USC Sections 1331-1356). It includes any amendment to those laws that are in effect during the policy period. It does not include any other federal workers' or workmen's compensation law, other federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

Part Two (Employers' Liability Insurance), C. Exclusions., exclusion 8., does not apply to work subject to the Outer Continental Shelf Lands Act.

## SCHEDULE

**Description and Location of Work:**

AS PER SCHEDULE ON FILE WITH COMPANY

Copyright 1991 National Council on Compensation Insurance.

WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

**WC 422**
**(4-92)**

WC 00 02 01 A (Ed. 4-92)

# MARITIME COVERAGE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on            3/15/00            at 12:01 A.M. standard time, forms a part of

(DATE)

Policy No.  ICW1950507        of the        UNITED PACIFIC INSURANCE COMPANY

issued to   FRIEDE GOLDMAN HALTER, INC

Premium  $    INCLUDED

_____

Authorized Representative

## SCHEDULE

1.  Description of work:

    AS PER SCHEDULE ON FILE WITH COMPANY

2.  Transportation, Wages, Maintenance and Cure Premium $    INCLUDED

3.  Limits of Liability
    Bodily Injury by Accident        1,000,000    each accident
    Bodily Injury by Disease         1,000,000    aggregate

This endorsement changes how insurance provided by Part Two (Employers' Liability Insurance) applies to bodily injury to a master or member of the crew of any vessel.

A.  **How This Insurance Applies is replaced by the following:**

A.  **How This Insurance Applies**

   This insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

   1.  The bodily injury must arise out of and in the course of the injured employee's employment by you.

   2.  The employment must be necessary or incidental to work described in Item 1. of the Schedule of the Maritime Coverage Endorsement.

   3.  The bodily injury must occur in the territorial limits of, or in the operation of a vessel sailing directly between the ports of, the continental United States of America, Alaska, Hawaii or Canada.

   4.  Bodily injury by accident must occur during the policy period.

   5.  Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

   6.  If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America, its territories or possessions or Canada.

C.  **Exclusions is changed by removing exclusion 10. and by adding exclusions 13. and 14.**

   This insurance does not cover:

   13. bodily injury covered by a Protection and Indemnity Policy or similar policy issued to you or for your benefit. This exclusion applies even if the other policy does not apply because of another insurance clause, deductible or limitation of

WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

**WC 269**
**(2-89)**

WC 00 03 01 A (Ed. 2-89)

## ALTERNATE EMPLOYER ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on     3/15/00     at 12:01 A. M. standard time, forms a part of
                                      (DATE)

Policy No.    ICW1950507         of the     UNITED PACIFIC INSURANCE COMPANY

Issued to    FRIEDE GOLDMAN HALTER, INC

Premium $     INCLUDED

_____
                                 Authorized Representative

This endorsement applies only with respect to bodily injury to your employees while in the course of special or temporary employment by the alternate employer in the state named in Item 2 of the Schedule. Part One (Workers' Compensation Insurance) and Part Two (Employers' Liability Insurance) will apply as though the alternate employer is insured. If an entry is shown in Item 3 of the Schedule, the insurance afforded by this endorsement applies only to work you perform under the contract or at the project named in the Schedule.

Under Part One (Workers' Compensation Insurance) we will reimburse the alternate employer for the benefits required by the workers' compensation law if we are not permitted to pay the benefits directly to the persons entitled to them.

The insurance afforded by this endorsement is not intended to satisfy the alternate employer's duty to secure its obligations under the workers' compensation law. We will not file evidence of this insurance on behalf of the alternate employer with any government agency.

We will not ask any other insurer of the alternate employer to share with us a loss covered by this endorsement.

Premium will be charged for your employees while in the course of special or temporary employment by the alternate employer.

The policy may be canceled according to its terms without sending notice to the alternate employer.

Part Four (Your Duties If Injury Occurs) applies to you and the alternate employer. The alternate employer will recognize our right to defend under Parts One and Two and our right to inspect under Part Six.

### Schedule

1. **Alternate Employer**                         **Address**

     AS REQUIRED BY WRITTEN CONTRACT

2. **State of Special or Temporary Employment**

3. **Contract or Project**

WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

WC 124
(4-84)

WC 00 03 13

# WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on          3/15/00          at 12:01 A. M. standard time, forms a part of
                                                            (DATE)

Policy No.    ICW1950507             of the        UNITED PACIFIC INSURANCE COMPANY

Issued to    FRIEDE GOLDMAN HALTER, INC                        (NAME OF INSURANCE COMPANY)

Premium $      INCLUDED                          _____
                                                            Authorized Representative

We have the right to recover our payments from anyone liable for an injury covered by this policy. We will not enforce our right against the person or organization named in the Schedule. This agreement applies only to the extent that you perform work under a written contract that requires you to obtain this agreement from us.
This agreement shall not operate directly or indirectly to benefit any one not named in the Schedule.

### Schedule

AS REQUIRED BY WRITTEN CONTRACT

WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

WC 129
(4-84)

WC 00 04 04

# PENDING RATE CHANGE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on          3/15/00                    at 12:01 A. M. standard time, forms a part of

(DATE)

Policy No.    ICW1950507              of the      UNITED PACIFIC INSURANCE COMPANY

(NAME OF INSURANCE COMPANY)

issued to    FRIEDE GOLDMAN HALTER, INC

Premium $    INCLUDED

_____
Authorized Representative

A rate change filing is being considered by the proper regulatory authority. The filing may result in rates different from the rates shown on the policy. If it does, we will issue an endorsement to show the new rates and their effective date.

If only one state is shown in Item 3.A of the Information Page, this endorsement applies to that state. If more than one state is shown there, this endorsement applies only in the state shown in the Schedule.

## Schedule

**State**

    ALL STATES LISTED UNDER ITEM 3.A. OF THE INFORMATION PAGE, THIS ENDORSEMENT
    DOES NOT APPLY TO CALIFORNIA AND MINNESOTA.

WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

WC 369
(7-90)

WC 00 04 14 (7-90)

# NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on        3/15/00              at 12:01 A. M. standard time, forms a part of

(DATE)

Policy No.    ICW1950507          of the      UNITED PACIFIC INSURANCE COMPANY

(NAME OF INSURANCE COMPANY)

Issued to      FRIEDE GOLDMAN HALTER, INC

_____

Authorized Representative

Experience rating is mandatory for all eligible insureds. The experience rating modification factor, if any, applicable to this policy, may change if there is a change in your ownership or in that of one or more of the entities eligible to be combined with you for experience rating purposes. Change in ownership includes sales, purchases, other transfers, mergers, consolidations, dissolutions, forma-tions of a new entity and other changes provided for in the applicable experience rating plan manual.

You must report any change in ownership to us in writing within 90 days of such change. Failure to report such changes within this period result in revision of the experience rating modification factor used to determine your premium.

NOT APPLICABLE IN THE STATE OF CALIFORNIA

Copyright, 1990 National Council on Compensation Insurance.

WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY

WC 412
(9-91)

WC 00 05 03 A (Ed. 9-91)

# RETROSPECTIVE PREMIUM ENDORSEMENT
# ONE YEAR PLAN

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on     3/15/00      at 12:01 A.M. standard time, forms a part of
(DATE)

Policy No.    ICW1950507    of the     UNITED PACIFIC INSURANCE COMPANY

issued to     FRIEDE GOLDMAN HALTER, INC     (NAME OF INSURANCE COMPANY)

Premium     INCLUDED

_____
Authorized Representative

This endorsement is added to Part Five (Premium) because you chose to have the cost of the insurance rated retrospectively. This endorsement explains the rating plan and how the retrospective premium will be determined.

This endorsement applies in the states listed in the Schedule. It determines the retrospective premium for the insurance provided during the rating plan period by this policy and any policy listed in the Schedule. The rating plan period is the one-year period beginning with the effective date of this endorsement.

The amount of retrospective premium depends on five standard elements and two elective elements.

## A. Retrospective Premium Standard Elements

The five standard elements are explained here.

1. Standard premium is the premium we would charge during the rating plan period if you had not chosen retrospective premium rating, but with two exceptions. Standard premium does not include the expense constant charge or the premium discount credit.

2. Basic premium is less than standard premium. It is standard premium multiplied by a percentage called the basic premium factor. The basic premium factor varies depending on the total amount of standard premium. The Schedule shows a range of basic premium factors for differing amounts of estimated standard premium. The actual basic premium factor will be determined after the standard premium is determined. If earned standard premium is not within the range of the estimated standard premiums shown in the Schedule, the basic premium will be recalculated.

3. Incurred losses are all amounts we pay or estimate we will pay for losses, interest on judgments, expenses to recover against third parties and employers liability loss adjustment expenses.

4. A converted loss is an incurred loss multiplied by a percentage called the loss conversion factor. The loss conversion factor is shown in the Schedule.

5. Taxes are a part of the premium we collect. Taxes are determined as a percentage of basic premium and converted losses. The percentage is called the tax multiplier. It varies by state and by Federal and non-Federal classifications. The tax multipliers are shown in the Schedule.

## B. Retrospective Premium Elective Elements

Two other elements are included in retrospective premium if you elected to include them. They are the excess loss premium for the loss limitation and the retrospective development premium. They are explained here.

1. The election of a loss limitation means that the amount of incurred loss to be included in the retrospective premium is limited to an amount called the loss limitation. The loss limitation applies separately to each person who sustains bodily injury by disease and separately to all bodily injury arising out of any one accident.

The charge for this loss limitation is called the excess loss premium. Excess loss premium is a percentage of standard premium multiplied by the loss conversion factor. The percentage is called the excess loss premium factor. Taxes are added to excess loss premium just as they are for other elements of retrospective premium.

Excess loss premium factors vary by state, by classification, and by the amount of the loss limitation. If you chose this elective element, the loss conversion factor, the loss limitation, the excess loss premium factors and the states where they apply are shown in the Schedule.

Copyright 1983, 1991 National Council on Compensation Insurance.

2. The retrospective development element is used to help stabilize premium adjustments. The premium for this element is charged with the first three calculations of retrospective premium, and is called the retrospective development premium. It is a percentage of standard premium multiplied by the loss conversion factor. The percentage of standard premium is called the retrospective development factor. Taxes are added to retrospective development premium just as they are for other elements of retrospective premium.

Retrospective development factors vary by state, by electing a loss limitation, and by first, second, and third calculations of retrospective premium. If you chose this elective element, the retrospective development factors are shown in the Schedule.

C.  **Retrospective Premium Formula**

Insurance policies listed in the Schedule will be combined with this policy to calculate the retrospective premium. If the policies provide insurance for more than one insured, the retrospective premium will be determined for all insureds combined, not separately for each insured.

1. Retrospective premium is the sum of basic premium, converted losses and taxes, plus the excess loss premium and retrospective development premium elective elements if you chose them.

2. The retrospective premium will not be less than the minimum nor more than the maximum retrospective premium. The minimum and maximum retrospective premiums are determined by applying the minimum and maximum factors shown in the Schedule to the standard premium.

3. If this endorsement applies to more than one policy or state, the standard premium will be the sum of the standard premiums for each policy and state.

D.  **Premium Calculations and Payments**

1. We will calculate the retrospective premium using all loss information we have as of a date six months after the rating plan period ends and annually thereafter. We will have the calculation verified by the appropriate rate service organization at your request.

We may make a special valuation of the retrospective premium as of any date that you are declared bankrupt or insolvent, make an assignment for the benefit of creditors, are involved in reorganization, receivership or liquidation, or dispose of all your interest in work covered by the insurance. You will pay the amount due us if the retrospective premium is more than the total

standard premium as of the special valuation date.

2. After a calculation of retrospective premium, you and we may agree that it is the final calculation. No other calculation will be made unless there is clerical error in the final calculation.

3. After each calculation of retrospective premium, you will pay promptly the amount due us, or we will refund the amount due you. Each insured is responsible for the payment of all standard premium and retrospective premium calculated under this endorsement.

E.  **Work in Other States**

If any of the policies provide insurance in a state not listed in the Table of States, and if you begin work in that state during the rating plan period, this endorsement will apply to that insurance if this rating plan applies in that state on an interstate basis. The retrospective premium standard elements, and the elective elements you chose, will be determined by our manuals for that state, and added to the Schedule by endorsement.

F.  **Cancelation**

1. If any insurance subject to this endorsement is canceled, the effective date of cancelation will become the end of the rating plan period for all insurance subject to this endorsement unless we agree with you, by endorsement, to continue the rating plan period.

2. If we cancel for nonpayment of premium, the maximum retrospective premium will be based on the standard premium for the rating plan period, increased pro rata to 365 days.

3. If you cancel, the standard premium for the rating plan period will be increased by our short rate table and procedure. This short rate premium will be the minimum retrospective premium and will be used to determine the basic premium.

The short rate premium will be used to determine the excess loss premium and retrospective development premium if you chose these elective elements.

The maximum retrospective premium will be based on the standard premium for the rating plan period, increased pro rata to 365 days.

4. Section F.3. will not apply if you cancel because:

a. all work covered by the insurance is completed;

b. all interest in the business covered by the insurance is sold; or,

c. you retire from all business covered by the insurance.

## SCHEDULE

NONE

1. Other policies subject to this Retrospective Premium Endorsement_____

ICW1950507

WC 412 (9-91)
WC 00 05 03 A (Ed. 9-91)

2. Loss Limitation: $ NONE
3. Loss Conversion Factor 0.670
   Minimum Retrospective Premium Factor 0.70
   Maximum Retrospective Premium Factor 1.30
4. The basic premium factors shown here are based on estimates of standard premium. If the actual standard premium is within the range of estimated standard premiums shown here, the basic premium factor will be obtained by linear interpolation to the nearest one-tenth of 1%. If the actual standard premium is not within the range of estimated standard premiums, the basic premium factor will be recalculated.

|  | 50% | 100% | 150% |
|---|---|---|---|
| Estimated standard premium: | $ 1842198 | $ 3680377 | $ 5520056 |
| Basic premium factor: | _____ | _____ | _____ |

5. The tax multipliers, excess loss premium factors and retrospective development factors, and the states where they apply, are shown in the Table of States.

## TABLE OF STATES

| State | Excess Loss Premium Factors | | Tax Multiplier | | Retrospective Development Factors | | |
|---|---|---|---|---|---|---|---|
| | State (Other than "F" Classes) | Federal ("F" Classes Only) | State (Other than "F Classes) | Federal ("F" Classes Only) | 1st | 2nd | 3rd |
| | | | | | | | |

WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

WC 09 06 06

(Ed. 10-98)

## FLORIDA EMPLOYMENT AND WAGE INFORMATION RELEASE ENDORSEMENT

This policy requires you to release certain employment and wage information maintained by the State of Florida pursuant to federal and state unemployment compensation laws except to the extent prohibited or limited under federal law. By entering into this policy, you consent to the release of the information.

We will safeguard the information and maintain its confidentiality. We will limit use of the information to verifying compliance with the terms of the policy.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective    3/15/00       Policy No.   ICW1950507          Endorsement No.
Insured    FRIEDE GOLDMAN HALTER, INC                                   Premium $   INCLUDED

Insurance Company                                    Countersigned by _____

       UNITED PACIFIC INSURANCE COMPANY

WC 09 06 06
(Ed. 10-98)              © 1998 National Council on Compensation Insurance, Inc.              Page 1 of 1

WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY              WC 17 06 01 B

(Ed. 12-99)

## LOUISIANA AMENDATORY ENDORSEMENT

This endorsement applies only to the insurance provided by the Policy because Louisiana is shown in Item 3.A. of the Information Page.

The **Cancellation** Condition of the policy is replaced by this Condition:

**D.  Cancellation**

1.  Written notice of such cancellation must be actually delivered or mailed to the insured or to his representative in charge of the subject of the insurance not less than twenty days prior to the effective date of the cancellation except where termination of coverage is for nonpayment of premium.

2.  Upon the written request of the named insured, the insurer shall provide to the insured in writing the reasons for cancellation of the policy. There shall be no liability on the part of and no cause of action of any nature shall arise against any insurer or its agents, employees, or representatives for any action taken by them to provide the reasons for cancellation as required by the Subparagraph.

3.  Where written notice of cancellation or nonrenewal is required and the insurer elects to mail the notice, the running of the time period between the date of mailing and the effective date of termination of coverage shall commence upon the date of mailing.

4.  Any policy may be canceled by the company at any time during the policy period for failure to pay any premium when due whether such premium is payable directly to the company or its agent or indirectly under a premium finance plan or extension of credit, by mailing or delivering to the insured written notice stating when, not less than ten days thereafter, such cancellation shall be effective.

5.  The mailing of any such notice shall be effected by depositing it in a sealed envelope, directed to the addressee at his last address as known to the insurer or as shown by the insurer's records, with proper prepaid postage affixed, in a letter depository of the United States Post Office. The insurer shall retain in its records any such item so mailed, together with its envelope, which was returned by the Post Office upon failure to find or deliver the mailing to the addressee.

6.  The affidavit of the individual making or supervising such a mailing shall constitute prima facie evidence of such facts of the mailing as are therein affirmed.

7.  The portion of any premium paid to the insurer on account of the policy, including unearned commission, unearned because of the cancellation and in amount as computed on the pro rata basis, must be actually paid to the insured or other person entitled thereto as shown by the policy or by any endorsement thereon, or be mailed to the insured or such person as soon as practicable following such cancellation. Any such payment may be made by cash, or by check, bank draft, or money order.

Section I., Actions Against Us, of Part Two (Employers Liability Insurance) of the policy is replaced by the following:

**I.  Actions Against Us**

You may not bring an action against us under this insurance unless:

1.  You have complied with all the terms of this policy; and
2.  The amount you owe has been determined with our consent or by actual trial and final judgment.

The bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this Part.

ICW1950507          3/15/00

WC 17 06 01 B
(Ed. 12-99)

Copyright, 1999 National Council on Compensation Insurance, Inc.

**This Condition is added to the policy:**

**Your Right to Remove Agent**

We will not change or remove the agent of record who wrote this policy prior to the termination or renewal of this policy unless you request the change or removal. If you request the change or removal of the agent, we will notify the agent in writing 30 days in advance of the change or removal.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement Effective     3/15/00          Policy No.   ICW1950507          Endorsement No.
Insured                                                                        Premium $   INCLUDED

           FRIEDE GOLDMAN HALTER, INC
Insurance Company                                      Countersigned by _____
           UNITED PACIFIC INSURANCE COMPANY

WC 17 06 01 B
(Ed. 12-99)

WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY
WC 17 06 02 A

# LOUISIANA COST CONTAINMENT ACT ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on      3/15/00      at 12:01 A.M. standard time, forms a part of
(DATE)

Policy No. ICW1950507          Endorsement No.

of the    UNITED PACIFIC INSURANCE COMPANY

(NAME OF INSURANCE COMPANY)

issued to FRIEDE GOLDMAN HALTER, INC

Premium (if any) $    INCLUDED

Authorized Representative

This endorsement applies only to the insurance provided by the policy because Louisiana is shown in Item 3.A. of the Information Page.

You may be eligible for a two (2) percent reduction in your premium if you attend a cost containment meeting conducted by the Occupational, Safety and Health Administration (OSHA) Section of the Office of Workers Compensation Administration. In order for you to receive the reduction, you must submit to us a certificate of attendance from the OSHA Section. The reduction will apply for a period of one year and will be applied to the policy becoming effective after the date you attended the cost containment meeting.

You may also be eligible for an additional five (5) percent reduction in your premium if you have attended a cost containment meeting and have subsequently satisfactorily implemented an occupational safety and health program prescribed by the OSHA Section. In order for you to receive the reduction, you must submit to us a Certificate of Satisfactory Implementation of Occupational, Safety and Health Program from the OSHA Section. The reduction will apply for a period of one year and will be applied to the policy becoming effective after the date of your certification.

Copyright, 1996 National Council on Compensation Insurance, Inc.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**

WC 22 06 01 B (Ed. 7-97)

# MINNESOTA CANCELATION AND NONRENEWAL ENDORSEMENT

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement Effective   3/15/00         Policy No.   ICW1950507         Endorsement No.
Insured                                                                 Premium $  INCLUDED
   FRIEDE GOLDMAN HALTER, INC

Insurance Company
   UNITED PACIFIC INSURANCE COMPANY                        _____
                                                           Countersigned by

This endorsement applies only to the insurance provided because Minnesota is shown in Item 3.A. of the Information Page.

**Cancelation of a New Policy**

If this policy is a new policy and has been in effect for fewer than 90 days, we may cancel for any reason by giving you notice at least 30 days before the effective date of cancelation.

**Cancelation of Other Policies**

If this policy has been in effect for 90 days or more, or if it is a renewal of a policy we issued, we may cancel for one or more of the following reasons:

1. Nonpayment of premium;

2. Misrepresentation or fraud made by you or with your knowledge in obtaining the policy or in pursuing a claim under the policy;

3. An act or omission by you that substantially increases or changes the risk insured;

4. Refusal by you to eliminate known conditions that increase the potential for loss after notification by us that the condition must be removed;

5. Substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk in writing this policy;

6. Loss of reinsurance by us which provided coverage to us for a significant amount of the underlying risk insured. Any notice of cancelation pursuant to this item shall advise you that you have 10 days from the date of receipt of the notice to appeal the cancelation to the commissioner of commerce and that the commissioner will render a decision as to whether the cancelation is justified because of the loss of reinsurance within 30 business days after receipt of the appeal;

7. A determination by the commissioner that the continuation of the policy could place us in violation of the Minnesota insurance laws; or

8. Nonpayment of dues to an association or organization, other than an insurance association or organization, where payment of dues is a prerequisite to your obtaining or continuing this policy. This item shall not apply to persons who are retired at 62 years of age or older or who are disabled according to Social Security standards.

If we cancel your policy for any of the reasons listed in (1) through (8), we will give notice at least:

1. 30 days before the effective date of cancelation, if we cancel for nonpayment of premium; or

2. 60 days before the effective date, if we cancel for a reason described in (2) though (8) above.

**Notice of Cancelation**

Any notice of cancelation under this endorsement shall be in writing and shall be sent by first class mail or delivered to you and any agent, to the last mailing addresses known to us. A cancelation notice for nonpayment of premium shall state the amount of premium due and the due date, and shall state the effect of nonpayment by the due date. Cancelation shall not be effective if payment of the amount due is made prior to the effective date of cancelation in the notice. A cancelation notice for some other reason shall state the specific reason for cancelation and shall state the effective date of cancelation. The policy will end on that date.

WC 355b (7-97)
WC 22 06 01 B (Ed. 7-97)                                              Page 1 of 2

**Refunds Due You**

If this policy is canceled, we will send you any premium refund due. If we cancel, the refund will be pro rata. If you cancel, the refund may be less than pro rata. The cancelation will be effective even if we have not made or offered a refund.

**Nonrenewal of Your Policy**

Any notice of nonrenewal shall be in writing and shall be sent by first class mail, or delivered to you and any agent, to the last mailing addresses known to us, at least 60 days before the expiration date.

We need not mail or deliver this nonrenewal notice if you have:

1. Insured elsewhere;

2. Accepted replacement coverage; or

3. Requested or agreed not to renew this policy.

WC 355b (7-97)
WC 22 06 01 B (Ed. 7-97)

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**       WC 42 03 01 F

**(Ed. 1-00)**

### TEXAS AMENDATORY ENDORSEMENT

This endorsement applies only to the insurance provided by the policy because Texas is shown in Item 3.A. of the Information Page.

### GENERAL SECTION

B.  **Who Is Insured** is amended to read:
    You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership or joint venture, and if you are one of its partners or members, you are insured, but only in your capacity as an employer of the partnership's or joint venture's employees.

D.  **State** is amended to read:
    State means any state or territory of the United States of America, and the District of Columbia.

### PART ONE—WORKERS COMPENSATION INSURANCE

E.  **Other Insurance** is amended by adding this sentence:
    This Section only applies if you have other insurance or are self-insured for the same loss.

F.  **Payments You Must Make**
    This Section is amended by deleting the words "workers compensation" from number 4.

H.  **Statutory Provisions**
    This Section is amended by deleting the words "after an injury occurs" from number 2.

### PART TWO—EMPLOYERS LIABILITY INSURANCE

C.  **Exclusions**
    Sections 2 and 3 are amended to add:
    This exclusion does not apply unless the violation of law caused or contributed to the bodily injury.
    Section 6 is amended to read:
    6.  bodily injury occurring outside the United States of America, its territories or possessions, and Canada. This exclusion does not apply to bodily injury to a citizen or resident of the United States of America, Mexico or Canada who is temporarily outside these countries.

D.  **We Will Defend**
    This Section is amended by deleting the last sentence.

### PART FOUR—YOUR DUTIES IF INJURY OCCURS

Number 6 of this part is amended to read:
6.  Texas law allows you to make weekly payments to an injured employee in certain instances. Unless authorized by law, do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

**ICW1950507      3/15/00**

## PART SEVEN—OUR DUTY TO YOU FOR CLAIM NOTIFICATION

**A.  Claims Notification**

We are required to notify you of any claim that is filed against your policy. Thereafter we shall notify you of any proposal to settle a claim or, on receipt of a written request from you, of any administrative or judicial proceeding relating to the resolution of a claim, including a benefit review conference conducted by the Texas Workers' Compensation Commission. You may, in writing, elect to waive this notification requirement.

We shall, on the written request from you, provide you with a list of claims charged against your policy, payments made and reserves established on each claim, and a statement explaining the effect of claims on your premium rates. We must furnish the requested information to you in writing no later than the 30th day after the date we receive your request. The information is considered to be provided on the date the information is received by the United States Postal Service or is personally delivered.

**COMPLAINT NOTICE:** SHOULD ANY DISPUTE ARISE ABOUT YOUR PREMIUM OR ABOUT A CLAIM THAT YOU HAVE FILED, CONTACT THE AGENT OR WRITE TO THE COMPANY THAT ISSUED THE POLICY. IF THE PROBLEM IS NOT RESOLVED, YOU MAY ALSO WRITE THE TEXAS DEPARTMENT OF INSURANCE, P.O. BOX 149091, AUSTIN, TEXAS 78714-9091, FAX # (512) 475-1771. THIS NOTICE OF COMPLAINT PROCEDURE IS FOR INFORMATION ONLY AND DOES NOT BECOME A PART OR CONDITION OF THIS POLICY.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

| | | |
|---|---|---|
| Endorsement Effective  3/15/00 | Policy No. ICW1950507 | Endorsement No. |
| Insured | | Premium $  INCLUDED |
| FRIEDE GOLDMAN HALTER, INC | | |
| Insurance Company | Countersigned by_____ | |
| UNITED PACIFIC INSURANCE COMPANY | | |

**WC 42 03 01 F (Ed. 1-00)**                                                    **Page 3 of 3**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**      **WC 42 03 04 A**

(Ed. 1-00)

## TEXAS WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT

This endorsement applies only to the insurance provided by the policy because Texas is shown in Item 3.A. of the Information Page.

We have the right to recover our payments from anyone liable for an injury covered by this policy. We will not enforce our right against the person or organization named in the Schedule, but this waiver applies only with respect to bodily injury arising out of the operations described in the Schedule where you are required by a written contract to obtain this waiver from us.

This endorsement shall not operate directly or indirectly to benefit anyone not named in the Schedule.

The premium for this endorsement is shown in the Schedule.

Schedule

1. ( ) Specific Waiver
   Name of person or organization

   ( X ) Blanket Waiver
   Any person or organization for whom the Named Insured has agreed by written contract to furnish this waiver.

2. Operations:
   AS PER SCHEDULE ON FILE WITH COMPANY
   AS REQUIRED BY WRITTEN CONTRACT
3. Premium:
   The premium charge for this endorsement shall be _____ percent of the premium developed on payroll in connection with work performed for the above person(s) or organization(s) arising out of the operations described.

4. Advance Premium:

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

| | | |
|---|---|---|
| Endorsement Effective | 3/15/00 | Policy No. ICW1950507 | Endorsement No. |
| Insured | | | Premium $ INCLUDED |

Endorsement Effective      3/15/00          Policy No. ICW1950507          Endorsement No.
Insured                                                                    Premium $ INCLUDED
   FRIEDE GOLDMAN HALTER, INC
Insurance Company                           Countersigned by_____
   UNITED PACIFIC INSURANCE COMPANY

**WC 42 03 04 A (Ed. 1-00)**                                              **Page 1 of 1**

GU 7966a
(5-59)

# COUNTERSIGNATURE ENDORSEMENT

This endorsement, effective    3/15/00                    , forms a part of Policy No.  ICW1950507

                             (12:01 A. M., standard time)

Issued to   FRIEDE GOLDMAN HALTER, INC

by      UNITED PACIFIC INSURANCE COMPANY

            STATE                 STATE PREMIUM

        FLORIDA                   $200.00

It is agreed that the signature appearing on this endorsement is the signature of a person duly authorized to countersign on behalf of the Company in the state designated above and which is appended hereto in conformity with the insurance laws of that state.

Countersigned by _____

                        Authorized Signature

GU 7966a
(5-59)

# COUNTERSIGNATURE ENDORSEMENT

This endorsement, effective    3/15/00                              , forms a part of Policy No.  ICW1950507

Issued to  FRIEDE GOLDMAN HALTER, INC
                    (12:01 A.M., standard time)

by      UNITED PACIFIC INSURANCE COMPANY

| STATE | STATE PREMIUM |
|---|---|
| MISSISSIPPI | $3,632,707.00 |

It is agreed that the signature appearing on this endorsement is the signature of a person duly authorized to countersign on behalf of the Company in the state designated above and which is appended hereto in conformity with the insurance laws of that state.

Countersigned by _____

Authorized Signature

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
M. Diane Koken, as Liquidator of RELIANCE
INSURANCE COMPANY (In Liquidation)

## DEFENDANTS
PAULA FINANCIAL

**(b)** County of Residence of First Listed Plaintiff  **Not Delaware**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **Dover, DE**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Sheldon K. Rennie, Esquire, FOX ROTHSCHILD LLP
919 N. Market Street, Wilmington, DE
(302) 654-7444

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
**Breach of Insurance Contract**

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE

DOCKET NUMBER

DATE
**January 26, 2007**

SIGNATURE OF ATTORNEY OF RECORD
(#3772)

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 7 - 4 8 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ____3____ COPIES OF AO FORM 85.

____1/26/07____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action